2002 SD 9

**FIRST NATIONAL BANK IN BROOKINGS, Plaintiff and Appellant,**

v.

**Charles W. KUECHENMEISTER and Darlene M. Kuechenmeister, husband and wife, Defendants,**

and

**Norwest Mortgage, Inc., Defendant and Appellee.**

No. 21891.

Supreme Court of South Dakota.

Considered on Briefs Nov. 13, 2001.

Decided Jan. 16, 2002.

Eric N. Rasmussen of Glover, Helsper & Rasmussen, Brookings, for plaintiff and appellant.

Gary J. Pashby and Lisa Hansen Marso of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for defendant and appellee.

KONENKAMP, Justice.

[¶ 1.] In preparing a mortgage loan, Norwest Bank contacted First National Bank on the status of its mortgage. Over a period of months, as Norwest processed its loan, First National repeatedly represented that its loan had a zero balance and that a satisfaction of mortgage would be forthcoming. Five months after Norwest's loan closed, First National issued its satisfaction. First National soon discovered that its loan had a substantial balance. It commenced an action to restore the priority of its mortgage lien. In denying relief, the circuit court held that although First National mistakenly satisfied its mortgage and the satisfaction was given after Norwest closed its loan, Norwest detrimentally relied on First National's continuous representations that its loan had been paid off. On appeal, First National contends that only the satisfaction itself could provide a legal basis for Norwest's reliance and that, because Norwest closed its loan before First National issued its satisfaction, no justifiable reliance occurred. Because detrimental reliance may accumulate from all the circumstances, we uphold the trial court's ruling that Norwest reasonably relied on First National's representations.

**Background**

[¶ 2.] In 1994, Norwest Bank gave Charles and Darlene Kuechenmeister two loans of $24,000 and $19,670. To secure the loans, the Kuechenmeisters granted Norwest first and second mortgages on their home in Brookings. In 1996, the Kuechenmeisters gave First National a third mortgage on their home to secure a loan of $45,000 on a business venture, the Dakota Inn Café. All three mortgages were still extant in the fall of 1998, when the Kuechenmeisters applied to Norwest for a new loan. With this money, they planned to refinance their two loans with Norwest and to pay off some accumulated credit card debt from the café.

[¶ 3.] In the process of applying for the new loan in October 1998, Charles Kuechenmeister mentioned to Pam Peterson, a home mortgage consultant at Norwest, that he and his wife might have a mortgage with First National. The Kuechenmeisters' credit report showed no existing obligation to First National. Peterson telephoned Cherry Tuma, a loan processor at First National, to learn whether it held a mortgage. Tuma told Peterson that First National had no record of a mortgage.

[¶ 4.] Norwest ordered title insurance. A title commitment issued in early November 1998 confirmed the existence of the first and second mortgages with Norwest, but it also showed a third mortgage with First National. Peterson again telephoned Tuma to ask whether First National indeed held this third mortgage. Tuma reaffirmed that First National had no record of that mortgage.

[¶ 5.] Norwest made a loan commitment of $64,000, the maximum allowable on the appraised value ($80,000) of the Kuechenmeisters' property. Had Norwest known of the First National mortgage and its outstanding balance of some $30,000 on the loan, Norwest would have been unable to make the new loan to the Kuechenmeisters because it would have been clear that they had no available equity. Upon receipt of a copy of the loan commitment in late November, Tim Hogan, an attorney

and closing agent for Norwest, contacted Tuma to inquire whether First National held a mortgage on the Kuechenmeister home. On previous occasions, both Peterson and Hogan had been directed to Tuma when inquiring of First National about the status of customer loans. Tuma again confirmed that First National held no such mortgage.

[¶ 6.] The closing of the refinanced Kuechenmeister loan with Norwest occurred on December 4, 1998. Charles Kuechenmeister again mentioned the possibility of a mortgage with First National; accordingly, Hogan again called Tuma, and she again told him that there was no mortgage. Hogan also called the Brookings County Register of Deeds to ask whether First National had filed a mortgage since the title insurance commitment had been prepared. Finding that it had not, Hogan proceeded to oversee the loan closing. During the three-day recision period after closing, and before the loan funds were disbursed, Hogan once more telephoned Tuma, who said that there was a zero balance on the bank's records and that a satisfaction of mortgage would be provided.

[¶ 7.] Five months later, the Kuechenmeisters met with Thomas Raines, First National's loan officer, to discuss a payment schedule on their loans. Raines informed them that First National did indeed hold an unsatisfied mortgage on their home. Charles Kuechenmeister called to tell Peterson of this fact; she in turn told Hogan.

[¶ 8.] Hogan then contacted Tuma and faxed her a copy of the title commitment. Tuma examined First National's hard-copy records, as she had earlier examined its computerized records, and was unable to find any evidence of the mysterious third mortgage. Tuma then drafted a satisfaction of mortgage and presented it to her supervisor, Barb Adelaine, for approval. Adelaine herself then checked First National's records for an obligation under the Kuechenmeister name, found none, and signed the satisfaction. It was then given to Hogan, who filed it with the Brookings County Register of Deeds on May 17, 1999.

[¶ 9.] Later that same day, First National personnel learned that the undiscovered third mortgage had been indexed under the business name of Dakota Inn, rather than under the name Kuechenmeister. Neither Tuma nor Adelaine were aware that it had been so indexed, and each had done her previous checking under the name Kuechenmeister. Up to that point, First National had not cross-indexed its commercial and residential loans by both individual and business names.

[¶ 10.] Still later on May 17, Mike Reisetter of Dakota Abstract and Title, upon learning that Norwest had obtained and recorded First National's satisfaction of mortgage, informed Tuma that the First National mortgage did not have a zero balance and that she had erred in issuing the satisfaction. Tuma immediately called Hogan and asked him to retrieve the satisfaction of mortgage. He declined.

[¶ 11.] Following a trial, the circuit court ruled that Norwest closed its loan in reliance on the oral representations it received from First National that a zero balance was shown on the Kuechenmeister mortgage loan and that First National would provide a satisfaction of mortgage. On appeal, First National contends that the trial court erred in denying its request to restore its mortgage priority over that of Norwest.

### Analysis and Decision

██ [¶ 12.] The circuit court made two key conclusions: (1) it was reasonable, under the facts, for Norwest, before it

closed the December 4th loan to the Kuechenmeisters, to have relied on First National's oral representations "that there was a zero balance showing on its Kuechenmeister mortgage and that a satisfaction of mortgage would be sent." (2) "Norwest lost substantial and material rights by its detrimental reliance on" First National's representations. Norwest's reliance took the form of paying off existing debts and "loaning new money in reliance upon its understanding that its mortgage dated December 4, 1998, would be first in priority." *

[¶ 13.] The question is whether the court should have applied the principles governing the equitable restoration of mortgage priority lost through mistake. We discussed this concept in *Madson v. Ballou*, 63 S.D. 501, 260 N.W. 831 (S.D. 1935): "Where a mortgage has been released or satisfied through accident or mistake, it may be restored in equity and given its original priority as a lien in the absence of paramount equities." *Id.* at 832 (citations omitted). Here, one of the trial court's conclusions of law addressed this point: First National *did* make a mistake in issuing a satisfaction of mortgage, and this mistake resulted from its failure to cross-reference its commercial and residential loans by both business and individual names. Accordingly, the principle of law set forth in *Madson* applies. Attendant on this principle, however, is the proviso that the mistaken satisfaction has not induced other creditors to change their positions. *Id.* The questions of law then reduce to this: did the action of First National induce Norwest to change its position? did Norwest lose any substantial and material rights by such action? and if

Norwest did change position to its detriment in relying on First National's action, was that reliance reasonable?

[¶ 14.] First National argues that Norwest did *not* change its position as a result of the actual issuing of a satisfaction; Norwest changed its position on its receipt of First National's oral representation "that there was a zero balance showing on its Kuechenmeister mortgage and that a satisfaction of mortgage would be sent." This is accurate as far as it goes, but it is more precise to say that First National's issuance of the satisfaction of the mortgage was merely the final step in formalizing its continuous series of oral representations that the Kuechenmeisters owed no money on a home mortgage and that, therefore, a satisfaction would be issued. These representations began with Pam Peterson's first inquiry of Cherry Tuma and arguably reached its apex of importance for Norwest with Tuma's response to Hogan's inquiry on the date of closing the new loan.

[¶ 15.] Just as First National's repeated oral assurances occurred over several months, so Norwest's change of position cannot be fixed to one instant of time. As the trial court found, reliance on such oral representations was the local practice in this industry. Accordingly, the trial court correctly concluded that Norwest changed its position as a result of First National's actions. As to whether Norwest lost substantial rights as a result of First National's repeated representations, the trial court found that Norwest would not have made what amounted to an unsecured loan of substantial size had it not

---

* A trial court's factual findings must be shown to be clearly erroneous before they can be overturned. *Lewis v. Moorhead*, 522 N.W.2d 1, 3 (S.D.1994). Conclusions of law, on the other hand, are reviewed *de novo*. *Id.* Neither side presents any material disagreements with the trial court's findings of fact. We review decisions in equity under an abuse of discretion standard. *Mattson v. Rachetto*, 1999 SD 51, ¶ 9, 591 N.W.2d 814, 817.

been for First National's series of mistaken representations.

 [¶ 16.] Finally, we consider whether Norwest's reliance was reasonable. First National refers us to the following passage in *Madson:*

> The question is whether, under the findings, defendant … had notice of circumstances sufficient to put a prudent person upon inquiry. If facts are sufficient to put a purchaser of a title or lien upon inquiry of any adverse right or equity of a third party, [then] want of diligence in making such inquiry is equivalent to a want of good faith.

260 N.W. at 833. First National points out (1) that the Kuechenmeisters had told Norwest personnel on more than one occasion that they might have a mortgage with First National, and (2) that the title commitment showed the existence of such a mortgage. First National then argues that Norwest was on notice that the mortgage did exist and under the obligation to resolve the conflict between the title commitment and the oral representations. First National urges us to find on the part of Norwest a want of diligence tantamount to a want of good faith. We conclude that the trial court was correct in emphasizing Norwest's repeated inquiries of First National. Norwest's diligence is evident also in Hogan's call to the Register of Deeds to learn whether there had been a recent recording of such a mortgage.

[¶ 17.] As explained in *Madson,* "[i]t is not enough that an intending purchaser entertain a mere suspicion of an unknown equity or interest. There must be *some clear neglect* to inquire after having some notice of *some definite equity or interest* in another." *Id.* (emphasis added). The Kuechenmeisters surmised that they might have a mortgage with First National. Norwest then went to First National, the purported mortgage holder. It is true that the title commitment provided notice of some equity or interest in First National, but the record shows no clear neglect on the part of Norwest to determine whether there was a mortgage and, if so, what its outstanding balance was. To the contrary, Norwest's repeated inquiries manifest diligence and good faith.

[¶ 18.] We affirm the trial court's conclusion that First National was not entitled to restoration of its mortgage priority.

[¶ 19.] GILBERTSON, Chief Justice, SABERS and AMUNDSON, Justices, and GORS, Acting Supreme Court Justice, concur.