#26985, #27007-a-SLZ

**2014 S.D. 99**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE DONALD HYDE TRUST.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RANDALL L. MACY
Judge

* * * *

DYLAN A. WILDE of
Wilde & Hunt Prof., LLC
Spearfish, South Dakota

Attorneys for appellant
Wilma Van Order.


JOHN K. NOONEY
MARLI A. SCHIPPERS of
Nooney, Solay & Van Norman, LLP
Rapid City, South Dakota

Attorneys for appellees
Baptist Children's Home and
Shepherd's Ministries.

* * * *

CONSIDERED ON BRIEFS
ON NOVEMBER 17, 2014

OPINION FILED **12/30/14**

ZINTER, Justice

[¶1.]      Donald Hyde had a will and later created a revocable trust that he funded with real estate and a brokerage account containing stock.  Hyde also executed five codicils before and after he created the trust.  In one post-trust codicil, he bequeathed the stock to his siblings.  However, the stock was in the trust, and under the trust, the stock was to be distributed to charities upon his death.  During his life, Hyde also deeded trust real estate to siblings and loaned his sister money that he obtained from the trust brokerage account.  Following Hyde's death, the circuit court supervising the trust ruled that: (1) the post-trust codicil did not modify the trust to conform to the codicil's dispositional provision bequeathing the stock to the siblings, (2) the trust should not be reformed to distribute the stock to the siblings, (3) the loan to the sister should be repaid to Hyde's estate rather than his trust, (4) the deeds conveying property to Hyde's siblings were delivered, and (5) the charities failed to meet their burden of proving that some of Hyde's dispositions were the result of undue influence.  One of Hyde's siblings appeals the first three rulings, and the charities appeal the latter two rulings.  We affirm.

*Facts and Procedural History*

[¶2.]      Donald Hyde died on December 19, 2011.  He never married and had no children, but he had five siblings—James Hyde, Jesse Hyde Jr., Ann Laughlin, Mary Riley, and Wilma Van Order.  Hyde was an extremely frugal man.  Due to his frugality, he often engaged in estate planning without the use of an attorney.  Hyde was, however, generous in giving to Baptist charities.  During his life, he donated

over $640,000 to Baptist Children's Home. He also provided for various Baptist organizations upon his death.

[¶3.] On December 6, 1999, Hyde executed a will. The will specifically devised real property in Florida, Arizona, West Virginia, and South Dakota. Hyde's Florida property was to go to Citranell Baptist Church; his Arizona property was to go to his siblings; his Spearfish residence was to go to Dianna Keester; his Spearfish Creek property was to go to the First Baptist Church in Spearfish; and the residue of his estate was to go to the First Baptist Church of West Virginia (25%), to Baptist's Children's Home (50%), and to Shepherd's Ministries (25%). On August 15, 2003, Hyde prepared his first hand-written codicil. When Hyde died, these two documents were found together in an envelope that had the words "updated" and "outdated in 2006" written on it.

[¶4.] In September 2006, Hyde had executed a revocable trust. The trust was prepared by Spearfish attorney Reed Richards to avoid probate. Richards testified that he explained the difference between a trust and a will to Hyde, and Richards gave Hyde a letter explaining the steps (like funding the trust) that were needed to make the trust effective. According to Richards, Hyde seemed to understand the difference between a will and a trust.

[¶5.] Unlike the will, the trust provided that upon Hyde's death, all real estate and personal property in West Virginia, a five-acre tract in Arizona, and the Spearfish Creek property in South Dakota was to be distributed to Jesse Jr., James, Mary, and Wilma. Ann was to receive Hyde's Spearfish residence and the personal property at the residence. One parcel of Florida land was to be distributed to the

Faith Baptist Church in Florida. Land near the Spearfish airport was to be distributed to Baptist Children's Home Family Ministry. And, as is particularly relevant to the first issue in this appeal, Hyde's Charles Schwab brokerage account (containing 10,000 shares of Unisource Energy stock) was now to be distributed to Baptist Children's Home (75%) and Shepherd's Ministries (25%). Finally, $2,000 and the residue of the trust were to be distributed to all five siblings. Hyde reserved the "right and power at any time and from time to time while living to revoke in whole or in part [the trust] . . . or to alter or amend any term or provision of the [trust]."

[¶6.]    One month after executing the trust, Hyde conveyed his residence, the Spearfish Creek property, and the airport property to the trust. Hyde also transferred his Charles Schwab account containing the stock into the trust. Six months later, he executed a second codicil. The codicil provided that Wilma was to receive the Spearfish Creek property in exchange for administering his estate in West Virginia and Florida. The codicil specifically indicated that "[t]he lot as previously mentioned in my will shall be eliminated." As previously mentioned, that property was in the trust.

[¶7.]    Hyde traveled to Florida for the winter in 2008. The following spring he started having difficulty eating and maintaining weight. Ann and Hyde's nephew drove Hyde to West Virginia where he began living with his sister Mary. Two or three days after Hyde arrived, Wilma visited Hyde. He informed Wilma that he wanted her to have the airport and Spearfish Creek properties, and he wanted Ann to have his residence. This was the same intent that Hyde had

expressed to three friends in the summer of 2008. Wilma, who was engaged in a real estate business in West Virginia, obtained the legal descriptions of those properties and prepared three quitclaim deeds conveying the properties to Wilma and Ann.[1] Hyde reviewed and executed the deeds, which conveyed the properties from the trust. Hyde then gave Wilma the deeds stating "here you go." Wilma put the deeds in her briefcase and then in her safe. Afterward, Hyde told two friends he had conveyed the properties to Wilma and Ann.

[¶8.] During that same conversation at Mary's house, Hyde also indicated that he wanted to give his Florida property to James, Mary, Wilma, and Ann. Wilma recommended going to an attorney for this transaction because there was concern about Jesse Jr.'s exclusion from the disposition. Hyde contacted a West Virginia attorney who prepared Hyde's third codicil. The codicil indicated it was a substitute for the paragraph in the will devising the property to Faith Baptist Church. (Citranell Baptist Church was the beneficiary under Hyde's will and Faith Baptist Church was the beneficiary under Hyde's trust). On June 5, 2009, the same day Hyde executed the three deeds conveying the Spearfish properties from the trust, he executed this codicil in front of two witnesses and a notary.

[¶9.] Later that day, Hyde told Wilma he wanted his siblings to have the 10,000 shares of Unisource Energy stock that were in his Charles Schwab account. Wilma used the West Virginia attorney's codicil as a template to make this

---

1.    It was not unusual for Hyde to ask Wilma to prepare deeds. In 1994, she prepared three deeds for Hyde conveying property he owned in Arizona.

disposition. This fourth codicil bequeathed the stock to Hyde's siblings.[2] However, the stock was in the trust, and under the trust the stock was to be distributed to Baptist Children's Home and Shepherd's Ministries. Hyde executed this codicil (hereinafter the "June 5, 2009 codicil") in front of a notary and two witnesses.

[¶10.] Hyde stayed with each of his sisters for a period of time while in West Virginia. In January 2010, he became very ill and was hospitalized. After his release and rehabilitation, Hyde stayed in an apartment that Wilma acquired. She paid the rent and utilities.

[¶11.] In July 2011, Hyde told Wilma that he wanted her to be executrix of his estate instead of Gary Heberlig. Wilma prepared Hyde's fifth codicil. The codicil provided that Wilma would replace Heberlig. However, Heberlig was not the designated executor of Hyde's estate. Heberlig was designated as a successor trustee under the trust.

---

2. In relevant part, the codicil provided:

> I GIVE, DEVISE, AND BEQUEATH UNTO MY BROTHERS AND SISTERS, NAMELY JESSE HYDE JR., JAMES E. HYDE, MARY L. RILEY, WILMA L. VANORDER [sic] AND ANN L. LAUGHLIN, 10,000 SHARES OF UNISOURCE ENERGY (UNS) FORMER TUCSON ENERGY, SCHWAB ACCOUNT. THIS IS TO BE GIVEN TO MY SIBLINGS AND NOT THE BAPTIST CHILDRENS HOME. IN THE EVENT ONE SIBLING DIES THAT SHARE IS TO BE DIVIDED AMONG LIVING SIBLINGS.

> I HEREBY RATIFY AND CONFIRM MY SAID WILL EXCEPT INSOFAR AS IT IS REVOKED OR MODIFIED BY THIS CODICIL.

The witness block to the Second Codicil specifically stated: "SIGNED, PUBLISHED AND DECLARED BY DONALD R. HYDE AS AND FOR HIS CODICIL TO HIS LAST WILL AND TESTATMENT."

[¶12.]        In November 2011, Wilma borrowed $26,000 from Hyde. Wilma was going to use the money to purchase and restore real estate. She promised to repay Hyde when she sold the property. Hyde obtained the money from his Charles Schwab account, which at that time was a trust asset.

[¶13.]        After Hyde's death, Heberlig and Baptist Children's Home requested court supervision of the trust, Heberlig's resignation, and the appointment of an independent trustee. Wilma objected and petitioned for her appointment as the successor trustee. The circuit court accepted supervision and appointed an independent successor trustee. Wilma then requested the court to determine if the trust was modified or should be reformed to conform to the June 5, 2009 codicil bequeathing the stock to Hyde's siblings instead of Baptist Children's Home and Shepherd's Ministries.

[¶14.]        Both Wilma and Baptist Children's Home filed motions for partial summary judgment. Baptist Children's Home requested the circuit court to determine that as a matter of law the June 5, 2009 codicil did not modify the trust. Wilma requested the circuit court to determine that the real property described in the 2009 deeds had been conveyed to the siblings in 2009. The circuit court granted Baptist Children's Home partial summary judgment, concluding that the June 5, 2009 codicil did not modify the trust. A ruling on all other issues was deferred for trial. After trial, the circuit court concluded that the trust should not be reformed to give the stock to the siblings as provided in the codicil. The court also concluded that the $26,000 loan to Wilma was to be repaid to Hyde's estate, the 2009 deeds were effective because they had been delivered, and Baptist Children's Home and

Shepherd's Ministries failed to meet their burden of proving the elements of undue influence in Hyde's execution of the 2009 deeds and the June 5, 2009 codicil.

[¶15.] Wilma appeals three issues. She contends the circuit court erred in determining that the June 5, 2009 codicil did not modify the trust. She further contends that if the trust was not modified, the court erred in not reforming the trust to conform to the disposition in the June 5, 2009 codicil. She finally contends that the court erred in determining that her $26,000 loan should be repaid to Hyde's estate rather than his trust. Baptist Children's Home and Shepherd's Ministries raise two issues by notice of review. They contend that the circuit court erred in determining the three deeds conveying the Spearfish properties were delivered. They also appeal the court's findings of no undue influence in Hyde's execution of the 2009 deeds and the June 5, 2009 codicil.

*Decision*

*Modification of a Trust by a Codicil*

[¶16.] Wilma does not dispute that the stock was in the trust. Wilma, however, argues that the June 5, 2009 codicil modified the trust, and the siblings are entitled to the stock under the trust as modified by the codicil. Wilma contends that the circuit court erred in concluding that the codicil was testamentary and therefore did not modify the trust. She also contends that Hyde did not understand the distinction between a will/codicil and a trust, and by his codicil, Hyde expressed his intent to modify his trust. Wilma points out that South Dakota's statutes

indicate we are not an "intent defeating state." Wilma contends that under South Dakota's statutes, the June 5, 2009 codicil modified the trust.[3]

[¶17.]    SDCL 55-1-14 provides that "[a]n interest in an existing trust can be transferred only by operation of law or by a written instrument subscribed by the person making the transfer or by his agent." Wilma argues that Hyde executed the June 5, 2009 codicil to change the beneficial interest in the 10,000 shares of Unisource Energy stock from Baptist Children's Home and Shepherd's Ministries to his five siblings. Wilma points out that the codicil referred to the same stock that was in the trust. She contends that "all that [is] required for a trustor to modify [a] beneficiary interest is to execute a written instrument providing for the transfer or change in the beneficiary interest." Wilma contends that under the Restatement (Third) of Trusts § 63 and *In re Estate of Bol*, 429 N.W.2d 467 (S.D. 1988), the codicil was a written instrument modifying the trust.

[¶18.]    The Restatement (Third) provides that "[a]bsent contrary provision in the terms of the trust, the settlor's power to revoke or modify the trust can be

---

3.    The court granted summary judgment on this issue, concluding that the codicil did not modify the trust because the codicil was testamentary and did not take effect at the time it was drafted. In reviewing summary judgment, we "determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Brandt v. Cnty. of Pennington*, 2013 S.D. 22, ¶ 7, 827 N.W.2d 871, 874 (quoting *Jacobson v. Leisinger*, 2008 S.D. 19, ¶ 24, 746 N.W.2d 739, 745). Although the circuit court granted summary judgment, the circuit court's final decision after trial also resolved a dispute of fact regarding Hyde's intent. Therefore, on the modification of trust issue, we review the circuit court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. *See Fin-Ag, Inc. v. Feldman Bros.*, 2007 S.D. 105, ¶ 19, 740 N.W.2d 857, 862 (quoting *American Bank & Trust v. Shaull*, 2004 S.D. 40, ¶ 11, 678 N.W.2d 779, 783).

exercised in any way that provides clear and convincing evidence of the settlor's intention to do so." Restatement (Third) of Trusts § 63(3) (2003). A comment to this section states that this "power can be exercised by a will or codicil that is executed after the creation of the trust and remains unrevoked at the settlor's death, and that refers expressly to the trust or the power or that otherwise clearly manifests the settlor-testator's intent to exercise the power." Restatement (Third) of Trusts § 63 cmt. h (2003). The Reporter's Notes to this comment cite the Uniform Trust Code § 602(c) (2000). U.T.C. § 602(c) provides "The settlor may revoke or amend a revocable trust . . . [and] if the terms of the trust do not provide a method . . . by . . . a later will or codicil that expressly refers to the trust or specifically devises property that would otherwise have passed according to the terms of the trust[.]" South Dakota has not, however, adopted U.T.C. § 602(c) or a similar statute.

[¶19.] In *Bol*, the testator executed a will giving her entire estate to her brother and sister. 429 N.W.2d at 468. Bol also had a tentative or Totten trust that was inconsistent with the will. *Id.* This Court concluded that the will revoked the trust. *Id.* at 470. Wilma acknowledges Hyde's trust was not a Totten trust. This is significant because with Totten trusts, modification is permitted merely on "some declaration of depositor, regardless of form, and regardless of whether made inter vivos or in a will, [that] sufficiently expresses or implies the existence of a revocatory intent." *Id.* at 469. Nevertheless, Wilma points out that in *Bol* this Court permitted a will to modify a trust.

[¶20.] On the other hand, Baptist Children's Home and Shepherd's Ministries urge this Court to follow language in *Schroeder v. Herbert C. Coe Trust*, 437 N.W.2d

178 (S.D. 1989) and the Restatement (Second) of Trusts (1959). In *Schroeder*, we stated that "[i]t is uniformly held that an attempt to revoke a trust by will is invalid. The power to revoke a trust must be exercised during the trustor's lifetime." *Id.* at 185. Wilma, however, points out that *Schroeder* involved an irrevocable trust and that the cited language was dictum.

[¶21.] Baptist Children's Home and Shepherd's Ministries also rely on the Restatement (Second) of Trusts—an earlier version of the restatement. That version states that if a settlor does not provide a method of revocation, "the power can be exercised in any manner which sufficiently manifests the intention of the settlor to revoke the trust." Restatement (Second) of Trusts § 330 cmt. i (1959). However, "[i]f the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in that manner or under those circumstances." Restatement (Second) of Trusts § 330 cmt. j (1959). Therefore, "[i]f the settlor reserves a power to revoke the trust by a transaction inter vivos, as, for example, by a notice to the trustee, he cannot revoke the trust by his will." *Id.* Baptist Children's Home and Shepherd's Ministries contend that Hyde specified the method of revocation by indicating that the trust was revocable "while living." Baptist Children's Home and Shepherd's Ministries further contend that because the will was testamentary and did not take effect while Hyde was living, the will did not conform to the method and circumstances specified.

[¶22.] Baptist Children's Home and Shepherd's Ministries point out that this version of the Restatement was applied in *Connecticut General Life Insurance Co. v.*

*First National Bank of Minneapolis*, 262 N.W.2d 403 (Minn. 1977). In that case, the testator executed a will purporting to "supercede and cancel any previous wills or trusts established by [the testator]." *Id.* at 404. A pre-existing trust provided that it could be revoked "by written instrument executed by Donor and delivered to any trustee . . . during Donor's lifetime[.]" *Id.* at 405. The court ruled that the will did not modify the trust because the settlor failed to comply with this provision for modification. *Id.* at 405-06. However, in applying the Restatement (Second) of Trusts, the court focused on the failure to provide the trustee written notice rather than notice "during Donor's lifetime." *Id.* Therefore, *Connecticut General Life* is not useful in applying the Restatement (Second) of Trusts § 330 in this case.

[¶23.]     Although there is no South Dakota law directly on point, we find the analysis in *Bol* helpful. Although *Bol* involved a Totten trust, we highlighted the most important consideration in cases where a trust is not specifically modified or revoked: the intent of the settlor/testator. "[I]n cases where the trust [is] not specifically revoked, . . . we must resort to a consideration of surrounding circumstances in order to determine whether the true intention of the depositor was to revoke the . . . trust." *Bol*, 429 N.W.2d at 470. The same consideration underlies both versions of the Restatement. *See* Restatement (Second) of Trusts § 330 cmt. i (1959) ("[T]he power can be exercised in any manner which *sufficiently manifests the intention* of the settlor to revoke the trust." (Emphasis added.)); Restatement (Third) of Trusts § 63 (2003) ("[T]he settlor's power to revoke or modify the trust can be exercised in any way that provides *clear and convincing evidence of the settlor's intention* to do so." (Emphasis added.)). Therefore, in this case, we must determine

if there was clear and convincing evidence that Hyde intended the codicil to modify the trust.

[¶24.] The circuit court entered a number of findings regarding Hyde's intent. The court noted that the June 5, 2009 codicil used the testamentary term "will," and the codicil contained no language purporting to modify the trust. Significantly, the court also found Wilma's assertion that Hyde did not know the difference between a will and a trust was "contrary to the evidence provided." The court specifically found that Attorney Richards explained the differences between a will and trust and that Hyde understood the legal ramifications of the trust. Richards also provided Hyde with a letter that informed him of the necessity of transferring real property and accounts that were going to be subject to the trust. The court further found that Hyde's own acts reflected that he knew he had to transfer property in and out of the trust to affect intended dispositions of trust assets. Indeed, when Hyde decided to transfer the real estate in Spearfish to Wilma and Ann, he did so by deeds from his trust. This suggested that he understood he had conveyed much of his property to the trust in order to avoid probating that property in accordance with his will. Nevertheless, Wilma points out that Hyde wrote the words "outdated" and "updated" on the envelope containing his will and first codicil. However, Hyde's overall estate plan was substantially changed by his execution of the trust in 2006, and these words are not necessarily indicative of intent to modify the trust.

[¶25.] We acknowledge that Hyde used the word "will," or referred to facts in the will, in three instances when Wilma contends Hyde meant to refer to his "trust" (in the second, third, and fifth codicils). But we are in no position to second guess

the circuit court's findings that Hyde understood the differences between a will and trust. Ultimately, we may suspect—even strongly suspect—that Hyde made a mistake in amending his will instead of amending his trust. But Wilma's *inference* of mistake is not "evidence that is so clear, direct, weighty, and convincing as to allow the trier of fact to reach [a] clear conviction [that Hyde intended his codicil to modify his trust] without hesitancy . . . ." *See In re S.W.*, 428 N.W.2d 521, 524 (S.D. 1988) (defining clear and convincing evidence). Attorney Richards indicated that Hyde understood the differences between a will and trust, and Hyde followed the requisite formalities in executing the codicil. Although there is evidence that Hyde desired his siblings to receive the shares of stock, the totality of the evidence, including his transfers in and out of the trust together with his use of a codicil referencing his will but not the trust, renders the evidence of his intent insufficient to allow his codicil to modify his trust.

[¶26.] Wilma also cites three cases from other jurisdictions in which a trust was modified by a will. All three are not only distinguishable, but they emphasize the requirement of clear and convincing evidence of intent to modify a trust. For example, in *In re Sahakian's Estate*, the testator bequeathed equal shares of stock to all his grandchildren in his will. 255 N.Y.S.2d 520, 521 (Sur. Ct. 1965). However, the stock was in a trust at the time of the will's execution with the eldest grandchild as the trust beneficiary. *Id.* Although a disposition to all grandchildren was ultimately approved by the court, it was approved because the court found a clear and definite purpose of the testator as all the parties stipulated "it was the

testator's intention that all his grandchildren share equally in this stock as prescribed in his will." *Id.* at 521-22.

[¶27.]     In *Sanderson v. Aubrey*, the testator specifically referred to the trust in her will, writing that the trust "is now formally revoked." 472 S.W.2d 286, 287 (Tex. Civ. App. 1971). The court found an effective revocation of the trust because there was "a 'definitive manifestation' of like revocation as of the date she signed her instrument of will . . . ." *Id.* at 288. Although the will was testamentary in part, it also was operative *in praesenti* for other parts. *Id.* *In re Estate of Davis* applied similar principles under similar facts. 671 N.E.2d 1302 (Ohio Ct. App. 1996). That court acknowledged that a will can act as an *in praesenti* instrument able to "amend[] a revocable trust during the life of the settlor where the settlor uses language which appropriately manifests an intention to do so." *Id.* at 1304. Like in *Sanderson*, the testator in *Davis* specifically referred to his trust in his will. *Id.* at 1303.

[¶28.]     In this case, Hyde did not specifically refer to his trust like the testators *Sanderson* and *Davis*. Nor was there a stipulation of intent by Hyde's beneficiaries like the situation in *Sahakian*. Moreover, the circuit court found that Hyde knew the difference between trusts and wills, and Wilma's assertion of mistake was not supported by clear and convincing evidence. We conclude that the circuit court did not err in concluding that the codicil did not modify the trust. Absent "clear and convincing evidence of the settlor's intention" to modify the trust by the codicil, *see* Restatement (Third) of Trusts § 63(3) (2003), we are unwilling to find a modification.

*Reformation of Trust*

[¶29.] SDCL 55-3-28 provides that "[o]n petition by a trustee or beneficiary, the court may reform the terms of the trust to conform to the trustor's intention if the failure to conform was due to a mistake of fact or law and the trustor's intent can be established." Wilma argues that Hyde's trust should be reformed to correct Hyde's mistake. However, this statute requires proof of mistake and proof of intent to modify. Here, for the reasons discussed above, there was no clear and convincing evidence of intent to modify the trust. Therefore, the circuit court did not err in denying reformation.[4]

*Loan*

[¶30.] Hyde loaned $26,000 to Wilma before his death. Hyde obtained the money from the Schwab account. Wilma argues that the loan was a trust asset and that Hyde must have believed the terms were reasonable or he would not have made the loan. Wilma contends that because a trust lien may be created under such circumstances, she must repay the trust rather than the estate so the lien can be discharged by the trust. *See* SDCL 55-1A-33 ("A trustee may advance income or make loans out of trust property to a beneficiary on terms and conditions the trustee considers to be fair and reasonable under the circumstances, for which such advance or loan the trustee shall have a lien on the future benefits of such beneficiary."). Baptist Children's Home and Shepherd's Ministries argue that we

---

4.   The parties disagree whether ambiguity is needed to consider extrinsic evidence supporting reformation. Because we have decided there was insufficient evidence of intent to modify the trust, we do not discuss the extrinsic evidence issue.

should defer to the circuit court's factual findings that Wilma borrowed the money from Hyde and agreed to repay him, not the trust. They also argue the term "may" in SDCL 55-1A-33 creates a permissive power of the trustee, but does not mandate that all loans that originate from trust funds are trust loans.

[¶31.] The circuit court found there was no agreement that Wilma would repay the trust. The court also found that the loan agreement was not specific in its terms and conditions, and there was no evidence that the loan terms were fair and reasonable. Therefore, the court found that no lien was created and that the loan was not an asset of the trust. We do not find these factual findings clearly erroneous. Wilma testified that she borrowed the money from Hyde and was to repay Hyde. Hyde also maintained the power to make inter vivos modifications of the trust. Considering all the facts and circumstances, we affirm on this issue. The loan must be repaid to Hyde's estate.

*Delivery of Deeds*

[¶32.] Baptist Children's Home and Shepherd's Ministries argue that the 2009 deeds transferring Hyde's Spearfish properties to Ann and Wilma were not validly delivered before Hyde's death. Therefore, Baptist Children's Home and Shepherd's Ministries contend that the Spearfish properties remain trust assets.

[¶33.] "A deed, to become effective, must be delivered by the grantor during his lifetime." *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 20, 790 N.W.2d 52, 60 (quoting *Spitzer v. Spitzer,* 84 S.D. 147, 151, 168 N.W.2d 718, 720 (1969)). "The delivery of a deed must be unconditional in nature and no delivery can be accomplished without the grantor relinquishing possession of the deed as well as all power and control

over it." *Nelson v. Nelson*, 293 N.W.2d 463, 466 (S.D. 1980). "[T]here exists a presumption of valid delivery where the deed was duly executed, acknowledged, and in possession of the grantee[.]" *Stockwell*, 2010 S.D. 79, ¶ 20, 790 N.W.2d at 60 (alterations in original) (quoting *Nelson*, 293 N.W.2d at 466). "[W]hen possession of the deed by the grantee is established, it is presumed that the grantor placed the deed in the grantee's possession with the intent to convey title." *Id.* Findings of fact and the application of law of those facts on the question of delivery are viewed under the clearly erroneous standard. *Id.*

[¶34.] Baptist Children's Home and Shepherd's Ministries argue that the 2009 deeds were not effectively delivered prior to Hyde's death. They contend that Hyde did not give up all power and control of the property because he treated it the same after he gave the deeds to Wilma. They point out that Hyde still paid property taxes on the property; that Hyde would have liked to have gone back to South Dakota should his health improve, but he did not reserve a life estate; and that the deeds were not filed until after Hyde's death. These arguments, however, overlook the presumption of valid delivery. *See Stockwell*, 2010 S.D. 79, ¶ 20, 790 N.W.2d at 60; *Nelson*, 293 N.W.2d at 466. After the deeds were acknowledged, Hyde gave them to Wilma stating "here you go." Thereafter, Wilma maintained exclusive possession of the deeds by placing them in her briefcase and then her safe, which did not contain any of Hyde's papers. Moreover, Hyde had conversations with friends both before and after delivery of the deeds confirming his conveyance of the properties.

[¶35.] Under the circumstances, physical delivery of the deeds was sufficient. Hyde's payment of property taxes was not enough to overcome the presumption of valid delivery. *See Hanifin v. Marsden*, 297 N.W.2d 172, 175 (S.D. 1980) (recognizing the importance of the relationship between certain grantors and grantees and finding that paying taxes, carrying insurance, or expressing desires to sell the property are not inconsistent with actual delivery). Baptist Children's Home and Shepherd's Ministries' reliance on *Larsen v. Morrison*, 293 N.W.2d 468 (S.D. 1980), is misplaced. *Larsen* indicated that physical delivery alone may not be sufficient, but in that case the deed was left with the grantor's attorney, not the grantee. *Id.* at 472. Moreover, the purported grantee in *Larsen* understood that the grantor would hold onto the property until she died. *Id.* at 470. In this case, there is no evidence that delivery was conditional, and Hyde had multiple conversations confirming his conveyance of the properties. We affirm the circuit court's findings that the deeds were effectively delivered.

*Undue Influence*

[¶36.] Baptist Children's Home and Shepherd's Ministries point out that Hyde became dependent upon his siblings following his illness and that Wilma lived with and assisted Hyde. They argue that a confidential relationship creating a presumption of undue influence arose relating to the June 5, 2009 codicil and the 2009 deeds. They also argue undue influence was established apart from the presumption. They contend that: Hyde was physically ill, making him susceptible to undue influence; there was the opportunity for influence during the time Wilma

provided Hyde assistance; and, because Hyde expressed his desire to transfer the property after moving to West Virginia, one can infer undue influence.

[¶37.] The existence of undue influence is established if the contestant proves: "(1) decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and, (4) a result clearly showing the effects of undue influence." *Stockwell*, 2010 S.D. 79, ¶ 35, 790 N.W.2d at 64 (quoting *In re Estate of Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d 277, 291). "A presumption of undue influence arises when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the [deed and codicil] and unduly profits therefrom." *Id.* ¶ 31, 790 N.W.2d at 63 (quoting *Pringle,* 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289) (internal quotation marks omitted). "A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another." *Id.* (quoting *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 27, 721 N.W.2d 438, 445) (internal quotation marks omitted). "When this presumption arises, the burden shifts to the beneficiary to show [s]he took no unfair advantage of the decedent. However, the ultimate burden remains on the contestant to prove the elements of undue influence by a preponderance of the evidence." *Id.* (quoting *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289). Undue influence is a question of fact, which is reviewed under the clearly erroneous standard. *Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d at 59.

[¶38.] The circuit court did not clearly err in finding that undue influence was not established whether or not a presumption of undue influence arose. First,

Wilma's opportunity to exert undue influence was minimal. Hyde had been living with Mary for just three days when he told Wilma of his intentions. And Hyde was still living with Mary on June 5, 2009, when the documents were prepared. Second, Hyde's intent was formed before the opportunity for influence arose. Hyde expressed his intent to three of his friends before he moved to West Virginia. Third, Hyde was not susceptible to undue influence. The circuit court found that Hyde was strong-willed and made his own business decisions. Any influence Wilma did exert was not "such as to destroy the free agency of [Hyde] and substitute [her] will" for Hyde's. *See In re Estate of Dokken*, 2000 S.D. 9, ¶ 34, 604 N.W.2d 487, 497 (quoting *In re Estate of Till,* 458 N.W.2d 521, 528 (S.D. 1990)). We affirm the circuit court's determination that Baptist Children's Home and Shepherd's Ministries failed to meet their burden of proving undue influence.

[¶39.]       GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.