#29868-a-SPM
**2023 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ESTATE OF OWEN A. THACKER,             Plaintiff and Appellant,

v.

VICTORIA TIMM,                         Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CARMEN MEANS
Judge

\* \* \* \*

A. JASON RUMPCA of
Riter Rogers, LLP
Pierre, South Dakota                   Attorneys for plaintiff and
                                       appellant.


ZACHARY W. PETERSON of
Richardson, Wyly, Wise,
    Sauck & Hieb, LLP
Aberdeen, South Dakota

LISA LOSANO CARRICO
Watertown, South Dakota                Attorneys for defendant and
                                       appellee.

\* \* \* \*

ARGUED
AUGUST 31, 2022
OPINION FILED **01/04/23**

#29868

MYREN, Justice

[¶1.]    The Estate of Owen A. Thacker appealed the circuit court's dismissal of the Estate's claims against Victoria Timm. We affirm.

**Facts and Procedural History**

[¶2.]    Owen Thacker and Victoria Timm met while employed together in the late 1980s. They began a romantic relationship and moved in together at Thacker's residence a short time later. That relationship continued until Thacker died in 2020, but they never married. Each had children from prior marriages. In 2002, Thacker retired and transferred ownership of his solely-owned residence to himself and Timm as joint tenants. Timm retired in 2006. From the beginning of the relationship, the couple shared household expenses informally. In their retirement, the couple purchased three Certificates of Deposit (CDs) using Thacker's funds.

[¶3.]    The first was a $20,000 CD issued to Timm in 2006 by Dacotah Bank ($20,000 CD) and made payable on death (POD) to Thacker. Timm continued to renew the CD with Dacotah Bank until 2015, when she withdrew the $20,000 to purchase a new $20,000 CD from Plains Commerce Bank. That CD was issued to Timm, POD to Thacker. The circuit court found that Thacker consented to each of these transactions.

[¶4.]    The second was a $15,000 CD issued in 2010 by Dacotah Bank to Timm and Thacker jointly, with rights of survivorship ($15,000 CD). In 2015, Timm withdrew the funds and purchased a new $15,000 CD from Plains Commerce Bank. The new CD was issued to Timm, POD to her son, Steven Cychosz. The circuit court found that Thacker consented to these transactions.

-1-

[¶5.] The third was a CD in 2013 for $30,000 issued by Plains Commerce Bank to Timm, POD to Thacker ($30,000 CD). The circuit court found that Thacker consented to this transaction.

[¶6.] In 2013, Thacker added Timm to his checking account as a joint owner with rights of survivorship. The couple then opened a new joint savings account with rights of survivorship. In 2015, Thacker rolled over his 401(k) from his employer into a traditional IRA with the Scott Munger Agency.[1] Thacker listed Timm as the death beneficiary on the new IRA account. Timm had referred Thacker to the Scott Munger Agency because she and other former coworkers had converted their 401(k)s to IRAs through that agency.

[¶7.] Thacker inherited a farm from his mother when she died in 2000. Thacker rented the farmland primarily to the Wohlleber brothers, Jim and Johnnylee. Thacker and Jim Wohlleber had been friends for over 30 years. A realtor, Norm Haan, talked with Thacker about selling the farm. In May 2014, Thacker agreed to sell the farm to the Wohllebers through Haan for $2.28 million. Thacker signed a listing agreement and purchase agreement. When Timm became aware of the proposed sale, she notified Thacker's daughter, Theresa Hanson. Hanson called Thacker to convince him not to proceed with the sale. Ultimately, Thacker did not attend the closing.

[¶8.] In June 2014, Hanson, Thacker, and Timm discussed Thacker's plans for his assets. Hanson recorded this conversation with the knowledge of Thacker

---

1. The Scott Munger Agency merged into the Vision Point Advisory Group in 2016.

and Timm. Following the conversation, Thacker and Timm added Hanson as a co-owner to their joint checking and savings accounts. They did this because Hanson explained to them that it would allow her to generate additional income for them by investing the contents in a mutual fund. Furthermore, Hanson explained that adding her would ensure that the funds in the account would go to Thacker's heirs upon the deaths of Thacker and Timm.

[¶9.] In July 2014, the Wohllebers sued Thacker, seeking specific performance of the purchase agreement to sell the farm. Haan joined the lawsuit, seeking commission from the sale. Hanson reacted to that lawsuit by filing a petition for guardianship and conservatorship over Thacker. As part of her efforts to obtain a guardianship and conservatorship, Hanson requested and received a supporting letter from Dr. Hollis Nipe. After hearing about the strife the sale of the farm was causing Thacker's family, Jim Wohlleber met with Thacker and agreed to drop the specific performance suit.

[¶10.] By the end of 2014, Thacker and Timm changed their minds about having Hanson on their accounts. They initially planned to remove Hanson from their accounts. When they learned that would require her consent, they withdrew the funds from those accounts and created new ones. Thacker and Timm owned these new joint accounts with rights of survivorship.

[¶11.] In early 2015, the Wohlleber lawsuit was officially settled, with the Wohllebers dropping the case in exchange for a five-year lease agreement. Haan settled as well, receiving a commission of $30,000 from Thacker. Thacker executed a trust agreement and placed the farm in trust to the benefit of Hanson and

Thacker's other daughter, Angelina Gadd. Hanson did not pursue the guardianship and conservatorship efforts any further.

[¶12.]     In 2017, Timm withdrew all funds from the $20,000 CD and the $15,000 CD, and she used the proceeds to open a new account with Edward Jones that was owned solely by her and listed Cychosz as the death beneficiary. Around the same time, Timm and Thacker moved their IRAs from Vision Point Advisory Group to Edward Jones. In November 2017, Timm and Thacker transferred funds from their joint savings account with rights of survivorship and funded two new joint accounts with rights of survivorship at Edward Jones. Ultimately, all the funds from those two accounts were combined into one account, leaving only one funded joint account. In 2018, Timm used the funds from the $30,000 CD to open another investment account with Edward Jones, solely owned by Timm, with Cychosz as the death beneficiary.

[¶13.]     In 2008, Thacker experienced a cerebellar bleed and was diagnosed with a small acoustic neuroma.[2] Thacker remained healthy until he began to have balance issues several years later. In early 2014, because of these balance issues,

---

2.     Dr. Nipe gave medical definitions in testimony to the circuit court:

> (1)     cerebellar bleed: "It's a bleed into a portion of the brain . . . at the base of the larger portion of the brain, the larger portion is the cerebral area but the cerebellar portion of it is a fairly sensitive and specific area at the base of the brain. . . . A bleed is where a blood vessel is broken open."
> (2)     stroke: "A stroke is where the blood supply is cut off."
> (3)     acoustic neuroma/schwannoma: "An over growth [sic] of the nerve tissue. . . . Patient may not have any symptoms depending on the size. Usually if it gets larger it will start to have some of the vestibular symptoms like vertigo, difficulty with balance, things on that order."

Thacker consulted with Timm's internal medicine physician, Dr. Nipe. Dr. Nipe referred Thacker to the Department of Neurology at Mayo Clinic in Rochester, Minnesota, where he was evaluated by Dr. Cory Kogelschatz and Dr. Joseph Matsumoto. Dr. Kogelschatz's medical records indicate that Thacker exhibited mild cognitive impairment, but his functionality remained normal and did not meet the criteria for dementia. Dr. Matsumoto's medical records indicate that besides gait and balance issues, Thacker's neurological exam did not reveal any defects.

[¶14.] Toward the end of 2014, while the Wohllebers' real estate lawsuit was pending and Hanson was still pursuing the guardianship over Thacker, Hanson emailed Dr. Nipe and proposed language for a letter recommending the appointment of a guardian and conservator for Thacker. Dr. Nipe issued a letter that used Hanson's language nearly verbatim and said a guardianship and conservatorship were necessary due to Thacker's acoustic neuroma and possible normal pressure hydrocephalus.[3] As previously noted, when the litigation over the farm was dropped and the farmland was placed in a trust, Hanson abandoned her efforts to obtain conservatorship and guardianship over Thacker.

---

3. Hydrocephalus is "[a] condition marked by an excessive accumulation of cerebrospinal fluid resulting in dilation of the cerebral ventricles and raised intracranial pressure; may also result in enlargement of the cranium and atrophy of the brain." Stedman's Medical Dictionary at 910 (28th edition).

   Normal pressure hydrocephalus is "a type of [hydrocephalus] developing usually in older people, due to failure of cerebrospinal fluid to be absorbed by the pacchionian granulations, and characterized clinically by progressive dementia, unsteady gait, urinary incontinence, and usually, a normal spinal fluid pressure." *Id.*

[¶15.]    In 2015, Thacker signed a non-springing power of attorney appointing Timm as attorney-in-fact to have broad authority to act on his behalf, with Hanson as contingent attorney-in-fact. Before and after the power of attorney, Timm helped Thacker schedule his appointments and made sure he attended them, kept him up to date on his medically prescribed exercises, made sure he stayed in touch with his daughters (often calling them and handing the phone to Thacker), and took care of miscellaneous household duties.

[¶16.]    Thacker's relatively good health continued until June 2018, when he entered a nursing home after suffering an aortic aneurysm.[4] For the first couple of months after he entered the nursing home, Timm used the joint checking account to pay the cost of the nursing home. In August, Thacker signed paperwork to transfer funds from his IRA to their joint checking account monthly to pay the nursing home's cost. Timm obtained this paperwork and brought it to Thacker.[5]

[¶17.]    In January 2019, Hanson and Gadd filed a petition to be appointed co-guardians and co-conservators for Thacker. Timm objected to the petition. In that

---

4.    An aneurysm is a "[c]ircumscribed dilation of an artery or a cardiac chamber, in direct communication with the lumen, usually resulting from an acquired or congenital weakness of the wall of the artery or chamber." Stedman's Medical Dictionary at 83.

An aortic aneurysm is a "diffuse or circumscribed dilation of a portion of the aorta (e.g., abdominal aortic [aneurysm], aortic arch [aneurysm])." Id.

5.    Also in 2018, Timm transferred $25,000 from the joint checking account to one of her individual accounts. Timm testified that this transfer was a mistake and when she learned about it in 2019 she returned the funds to the joint account. Her version of the events was consistent with the financial records. The circuit court determined these transfers were not made for an improper purpose.

guardianship and conservatorship case—separate from the case before us on appeal—a different circuit court found that Thacker was unable to take care of his own daily needs and appointed Hanson and Gadd as his co-guardians and co-conservators in October 2019.

[¶18.] After they were appointed co-guardians and co-conservators, Hanson and Gadd filed this suit on behalf of Thacker against Timm, alleging breach of fiduciary duty, conversion, and undue influence. When Thacker died, Hanson was appointed as personal representative to Thacker's estate. After Thacker's death, the parties agreed that Thacker's estate (Estate) could be substituted to replace Hanson and Gadd as the Plaintiff.

[¶19.] This case proceeded to a bench trial, during which the Estate added a claim for breach of duty as trustee of implied trust. The circuit court issued a bench ruling, followed by written findings of fact and conclusions of law, which incorporated the bench ruling. The circuit court determined: (1) Timm did not owe a fiduciary duty to Thacker concerning the CDs, bank accounts, and retirement accounts; (2) Timm did not convert Thacker's assets; (3) Timm did not exert undue influence upon Thacker; and (4) the joint bank accounts were not implied trusts. The Estate appeals.

### Analysis

1. ***Whether the circuit court erred when it determined that Timm did not owe a fiduciary duty to Thacker concerning the CDs, bank accounts, and retirement accounts.***

[¶20.] "[A]s a matter of law, a fiduciary relationship exists whenever a power of attorney is created." *Estate of Stoebner v. Huether*, 2019 S.D. 58, ¶ 17, 935

N.W.2d 262, 267 (quoting *Hein v. Zoss*, 2016 S.D. 73, ¶ 8, 887 N.W.2d 62, 65).

However, the Estate acknowledged that Timm had not breached the fiduciary duty

that arose from the power of attorney, instead claiming that she breached a

fiduciary duty arising from the nature of the relationship between Thacker and

Timm.

[¶21.]     Fiduciary duties "arise only when one undertakes to act primarily for

another's benefit.  The law will imply such duties only where one party to a

relationship is unable to fully protect its interests and the unprotected party has

placed its trust and confidence in the other."  *Ward v. Lange*, 1996 S.D. 113, ¶ 12,

553 N.W.2d 246, 250 (quoting *High Plains Genetics Rsch. Inc. v. JK Mill-Iron

Ranch*, 535 N.W.2d 839, 842 (S.D. 1995)).  "While there is no 'invariable rule' for

determining whether a fiduciary relationship exists, 'there must be not only

confidence of the one in the other, but there must exist a certain inequality,

dependence, weakness of age, mental strength, business intelligence, knowledge of

the facts involved, or other conditions giving to one advantage over the other.'"

*Wyman v. Bruckner*, 2018 S.D. 17, ¶ 28, 908 N.W.2d 170, 179 (quoting *Bienash v.

Moller*, 2006 S.D. 78, ¶ 11, 721 N.W.2d 431, 434).

[¶22.]     "The existence and scope of a fiduciary duty are questions of law.

Whether a breach of a fiduciary duty occurred, however, is a question of fact."

*Smith Angus Ranch, Inc. v. Hurst*, 2021 S.D. 40, ¶ 14, 962 N.W.2d 626, 629 (quoting

*Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 37, 652 N.W.2d 756, 772).  The

circuit court's "findings of fact will not be set aside unless they are clearly

erroneous.  SDCL 15-6-52(a).  We will declare a finding of fact clearly erroneous

only if we are definitely and firmly convinced that a mistake has been made." *Lien v. Lien*, 2004 S.D. 8, ¶ 14, 674 N.W.2d 816, 822 (citing *First Nat'l Bank in Brookings v. Kuechenmeister*, 2002 S.D. 9, ¶ 12, 639 N.W.2d 184, 187). "We review the [circuit] court's conclusions of law de novo." *Id.* (citing *Carstensen Contracting, Inc. v. Mid-Dakota Rural Water Sys., Inc.*, 2002 S.D. 136, ¶ 8 n.2, 653 N.W.2d 875, 877 n.2).

[¶23.]     The Estate argued that a fiduciary relationship existed between Timm and Thacker because he was not handling his financial affairs and depended on Timm. The Estate heavily relies upon its contention that Thacker has been cognitively impaired since 2014. After finding the facts, the circuit court concluded that Timm owed no other fiduciary duty to Thacker besides the one established by the power of attorney. Because the Estate conceded that Timm had not violated her fiduciary duty arising out of the power of attorney and there was no other fiduciary duty owed, the circuit court found no breach of fiduciary duty.

[¶24.]     A mental infirmity could create a circumstance in which a person in a position of confidence could gain an advantage over the person with the infirmity. The circuit court heard the evidence presented and found that Thacker could manage his affairs through September 2018, when he entered the nursing home. Additionally, the circuit court noted the close relationship between Timm and Thacker and specifically found "[t]hey were not unequal in position of influence." These findings are consistent with significant evidence in the settled record.

[¶25.]     Dr. Nipe testified about his March 21, 2014 examination of Thacker (his only examination of Thacker). He discussed his medical records, which indicated that the purpose of the examination was to address balance issues,

-9-

memory loss, muscle weakness, and ataxia.[6] Following his examination, Dr. Nipe referred Thacker to the Mayo Clinic for further consultations. This was the extent of Dr. Nipe's involvement with Thacker's care. The medical records admitted into evidence documenting Dr. Matsumoto's and Dr. Kogelschatz's examinations at Mayo Clinic in 2014 indicate that Thacker's cognitive functionality remained normal. These examinations took place the same year Thacker and Timm created their new accounts without Hanson. These evaluations are the most recent medical records offered to the circuit court regarding Thacker's cognitive status. All other evidence regarding Thacker's cognitive abilities after 2014 came from lay witnesses testifying based on their observations of Thacker during their interactions with him.

[¶26.]     Hanson testified about her concerns with various transactions involving Thacker and Timm and her perceptions of Thacker's cognitive abilities over time. Gadd did not testify that her father had any cognitive deficiencies. On the other hand, Jim Wohlleber testified that Thacker had a sharp mind into the latter half of 2018 after he entered the nursing home. Another close friend, Debra Kany, testified that in the year leading up to his 2018 admittance to the nursing home, she did not observe any problems with Thacker's memory. She testified, "his mind was always good." Scott Munger, one of Thacker's financial advisors, testified that Thacker did not show any mental problems during their 2015 meeting. Cory

---

6.     Ataxia is "an inability to coordinate voluntary muscular movements that is symptomatic of some central nervous system disorders and injuries and not due to muscle weakness[.]" *Ataxia*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ataxia.

Herzog, another of Thacker's financial advisors, testified that during their 2017 meeting, Thacker did not show any indication that he did not understand the conversation. As financial advisors, Munger and Herzog had training or experience dealing with clients with mental impairment. Finally, evidence showed that while Timm would handle most of the finances, Thacker would handle some of the finances and other things such as mowing the lawn and driving. None of the conditions that give rise to an advantage of one partner over the other, such as inequality, are evident in the record.

[¶27.] Based on its findings, the circuit court concluded that "there was no credible evidence presented that [Timm] acted in a fiduciary capacity as to any of the events at issue in [Estate's] Complaint, including, but [not] limited to, the certificates of deposit, the Wells Fargo Bank accounts, the investment accounts, or the farmland sale. [Timm] never utilized the Power of Attorney to conduct any business on [Thacker's] behalf and was never placed on any account in a fiduciary capacity." A de novo review of the settled record establishes that the circuit court did not err in determining that Timm did not owe Thacker any fiduciary duty separate from any fiduciary duty arising from the power of attorney.

> **2.      Whether the circuit court clearly erred when it determined that the joint accounts were created with the intention that the rights of survivorship attach to them.**

[¶28.] "[A]n account opened in joint names raises a rebuttable presumption that the creator of such an account intended . . . rights of survivorship[ ] to attach to it." *In re Estate of Kuhn*, 470 N.W.2d 248, 250 (S.D. 1991) (alteration and omissions

in original) (quoting *Wagner v. Wagner*, 83 S.D. 565, 571, 163 N.W.2d 339, 342 (1968)).

> The presumption that an asset held in joint tenancy passes to the second party upon the death of the first can be rebutted only by a showing with clear and convincing evidence that the original depositor or purchaser did not intend rights of survivorship to attach to the joint asset, but merely intended the arrangement for her own convenience.

*Id.* (footnote omitted) (citing cases).

[¶29.]     A joint account is defined as: "any account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship[.]" SDCL 29A-6-101. "The term 'account' includes certificates of deposit." *Schuldies v. Millar*, 1996 S.D. 120, ¶ 22, 555 N.W.2d 90, 98 (citing SDCL 29A-6-101(1)).

[¶30.]     "The question of what the original depositor intended is a question of fact. As with all findings of fact, this court reviews the trial court's determination of the original depositor's intention under the 'clearly erroneous' standard." *Kuhn*, 470 N.W.2d at 251 (citation omitted) (citing *Temple v. Temple*, 365 N.W.2d 561, 565 (S.D. 1985)).

[¶31.]     The joint accounts at issue are: (1) Edward Jones investment account; (2) Wells Fargo checking account; (3) Wells Fargo savings account; and (4) $15,000 CD (the funds of which ultimately ended up in one of Timm's Edward Jones investment accounts). The joint Edward Jones account expressly defined the ownership status as "joint tenants with right of survivorship." The Estate conceded in its amended complaint that Thacker and Timm jointly owned the Wells Fargo

accounts. The Estate also admitted in its amended complaint that the $15,000 CD was owned by Thacker and Timm jointly with rights of survivorship.

[¶32.] Still, the Estate argues that Thacker intended that Timm would only be left with their house when Thacker died and that Thacker added Timm to his Wells Fargo checking account for the limited purpose of helping him pay bills—not so that she would receive rights of survivorship. The Estate also argues that adding Hanson to the original Wells Fargo account in 2014 showed that Thacker did not want Timm to inherit the money. The Estate's argument ignores Thacker's subsequent actions. Shortly after they added Hanson to their accounts, Thacker and Timm intentionally reversed that action by creating new joint accounts (with rights of survivorship) at Wells Fargo to exclude Hanson from the accounts. The circuit court considered all the evidence presented and found that Thacker intended his cash assets to go to Timm. The evidence in the record supports this finding.

### 3. Whether the circuit court clearly erred when it determined that Timm did not exert undue influence upon Thacker.

[¶33.] "Undue influence is found when the free agency of the [person unduly influenced] has been destroyed and the will of another is substituted for that of the [person unduly influenced]." *In re Madsen*, 535 N.W.2d 888, 893 (S.D. 1995) (citing *In re Blake's Estate*, 81 S.D. 391, 398, 136 N.W.2d 242, 246 (S.D. 1965)). "Undue influence requires [1] a person susceptible to undue influence; [2] an opportunity to exert undue influence and effect a wrongful purpose; [3] a disposition to do so for an improper purpose; and [4] a result clearly showing the effect of undue influence." *Delany v. Delany*, 402 N.W.2d 701, 705 (S.D. 1987) (citing *Kase v. French*, 325

N.W.2d 678, 680 (S.D. 1982)). "Undue influence is a question of fact, which is reviewed under the clearly erroneous standard." *In re Donald Hyde Tr.*, 2014 S.D. 99, ¶ 37, 858 N.W.2d 333, 345 (citing *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d 52, 59).

[¶34.]     "Under certain circumstances, a confidential relationship can give rise to a presumption of undue influence." *Black v. Gardner*, 320 N.W.2d 153, 157 (S.D. 1982) (quoting *In re Pierce's Estate*, 299 N.W.2d 816, 819 (S.D. 1980)).  The circuit court concluded there was no confidential relationship between Timm and Thacker and thus did not impose the presumption of undue influence.  The presumption would have imposed on Timm "the burden of going forward with a reasonable explanation[.]" *In re Estate of Pringle*, 2008 S.D. 38, ¶ 40, 751 N.W.2d 277, 289 (quoting *In re Podgursky's Estate*, 271 N.W.2d 52, 59 (S.D. 1978)).  Once that burden is met, the presumption is overcome, and the party asserting undue influence must prove all of the elements by a preponderance of the evidence. *Donald Hyde Tr.*, 2014 S.D. 99, ¶ 37, 858 N.W.2d at 344.

[¶35.]     "A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another." *Madsen*, 535 N.W.2d at 892 (quoting *In re Weickum's Estate*, 317 N.W.2d 142, 145 (S.D. 1982)).  "In determining whether a confidential relationship exists, we consider such factors as the amount of time the beneficiary spent with the testator, whether the beneficiary handled many of the testator's personal or business affairs, and whether the testator ever sought the advice of the beneficiary." *Id.*  We recently held that "[a]lthough '[t]he existence of a confidential relationship is [generally] a question of

fact rather than law[,]' under our decisional law, a confidential relationship exists *as a matter of law* between Ken and Susan because they were husband and wife." *Johnson v. Markve*, 2022 S.D. 57, ¶ 42, 980 N.W.2d 662, 675 (second, third, and fourth alterations in original) (citation omitted) (quoting *Delany*, 402 N.W.2d at 705). Thacker and Timm were not legally married, but the circuit court found "[Thacker] and [Timm] had as much of a husband and wife relationship as those who are legally married." This finding is at odds with the court's determination that a confidential relationship did not exist between Thacker and Timm. Nonetheless, even if a confidential relationship existed and the court did not properly impose a presumption of undue influence, we find any error to be harmless. *See* SDCL 15-6-61.

[¶36.] We explained in *Johnson* that "the burden of going forward with the evidence at trial would shift to [the defendant, when the presumption is applied,] to prove 'he took no unfair advantage of the decedent.' However, the ultimate burden of proving undue influence remains with the [plaintiff]." 2022 S.D. 57, ¶ 43, 980 N.W.2d at 675 (citation omitted) (citing *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289). Both parties presented their evidence and fully litigated the issue of undue influence. After considering all of the evidence, the circuit court found that the evidence did not establish that Thacker was susceptible to any undue influence before the 2017-2018 timeframe, did not establish that Timm had the disposition to exert any undue influence, and did not establish a result clearly showing the effects of undue influence. Accordingly, the circuit court found that "the elements of undue

influence have not been met." The record supports the court's findings, and any error in the burden-shifting was harmless.

[¶37.] The Estate argues that the circuit court clearly erred in finding that Thacker was not susceptible to undue influence. The circuit court found that although it is possible Thacker was susceptible in the 2017-2018 timeframe, his intent that his cash assets go to Timm existed long before then, when he was not susceptible to undue influence. The Estate claims Thacker's medical records show mental weakness dating back to 2012. However, substantial evidence in the record indicates that Thacker remained mentally acute well into 2018 and remained independent and strong-willed to the extent that he was not susceptible to undue influence. The evidence in the record that supports the circuit court's susceptibility finding is essentially the same evidence that supported the circuit court's fiduciary duty analysis: (1) Thacker's medical records demonstrate that his evaluations in 2014 showed normal functionality; (2) his financial advisors testified that in 2015 and 2017 he did not exhibit memory or comprehension problems; and (3) testimony from friends indicated that Thacker remained sharp without memory problems in 2017 and 2018. The circuit court was not clearly erroneous in finding that Thacker was not susceptible to undue influence before 2017.

[¶38.] The Estate also argues that the circuit court clearly erred in finding that Timm did not have the disposition to exert undue influence. The Estate claims that her disposition to exert undue influence is established by: (1) the fact that Timm opposed the guardianship/conservatorship; (2) the fact that Timm convinced Thacker to appoint her as his attorney-in-fact; and (3) the fact that Timm gave

several gifts to herself and her family members from the joint account. In determining that Timm did not have the disposition to exert undue influence, the circuit court relied heavily on the fact that Thacker and Timm had been supporting one another and planning for their futures for over thirty years. Additionally, the circuit court noted that when Timm learned of Thacker's contract to sell the farmland, she immediately informed Hanson. Had Timm simply allowed the sale to go forward, the proceeds likely would have been placed in the joint account over which she had a right to survivorship. Instead, Timm encouraged Thacker's efforts to avoid the sale of the farm and his subsequent creation of a trust so that his daughters would receive the farm as he intended. Moreover, Timm helped maintain Thacker's relationships with his daughters. These actions are not consistent with a person disposed to unduly influence Thacker to the detriment of his children. The circuit court's finding that Timm was not disposed to unduly influence Thacker is not clearly erroneous.

[¶39.] The Estate argues that the fact that Timm received a significant amount of money that was initially Thacker's money clearly shows an effect of undue influence. This ignores the possibility that Thacker wanted Timm to receive his cash assets out of love and devotion instead of undue influence. Perhaps most compelling is that in the June 5, 2014 recorded conversation, Thacker confirmed that he intended his cash assets to be used to take care of himself and Timm. The circuit court was not clearly erroneous in its finding that there was no result clearly showing an effect of undue influence.

[¶40.] The Estate needed to prove each element required to establish a claim based on undue influence. The circuit court found that the Estate failed to show susceptibility, disposition to exert undue influence with an improper purpose, and result clearly showing an effect of undue influence. These findings are supported by evidence in the record and, thus, are not clearly erroneous.

### 4. Whether the circuit court clearly erred when it determined that Timm did not convert Thacker's assets.

[¶41.] "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such right." *Wyman v. Terry Schulte Chevrolet, Inc.*, 1998 S.D. 96, ¶ 32, 584 N.W.2d 103, 107 (citing *Ward*, 1996 S.D. 113, ¶ 17, 553 N.W.2d at 251). A successful claim for conversion will meet four necessary elements:

> (1) [plaintiff] owned or had a possessory interest in the property;
> (2) [plaintiff's] interest in the property was greater than the [defendant's];
> (3) [defendant] exercised dominion or control over or seriously interfered with [plaintiff's] interest in the property; and
> (4) such conduct deprived [plaintiff] of its interest in the property.

*W. Consol. Co-op. v. Pew*, 2011 S.D. 9, ¶ 22, 795 N.W.2d 390, 397 (alterations in original) (quoting *First Am. Bank & Tr., N.A. v. Farmers State Bank of Canton*, 2008 S.D. 83, ¶ 38, 756 N.W.2d 19, 31). Consent defeats a claim for conversion. *See Estate of Bronson*, 2017 S.D. 9, ¶ 14, 892 N.W.2d 604, 609–10 (affirming the dismissal of conversion claim where the account owner consented to add his POA to his account, thereby creating a joint account). Whether conversion occurred is a

question of fact reviewed under the clearly erroneous standard. *See Fin-Ag, Inc. v. Feldman Bros.*, 2007 S.D. 105, ¶ 38, 740 N.W.2d 857, 866.

[¶42.]     Regarding the Estate's conversion claims, the circuit court found:

> There was no credible evidence provided that Vicky Timm converted anything wrongfully to her own assets. At all times, it was [Thacker's] intention for his cash assets to be used to take care of both [Timm] and [Thacker] and to be used by [Timm] for her own needs after [Thacker's] death. [Timm] and [Thacker] consulted with each other about everything and [Timm's] actions were conducted with [Thacker's] knowledge and correspond with his wishes. At all times, funds from all the bank accounts, whether held in [Timm's] name and/or [Thacker's] name were used for both their living and household expenses. There was no unwarranted interference by [Timm] in using [Thacker's] cash assets for the benefit of [Timm] and/or [Thacker].

[¶43.]     The non-joint CDs were initially issued in 2006 and 2013. Thacker provided the funds to purchase the CDs, and there is no evidence in the record that he lacked the capacity to do so. The circuit court found that Thacker knew of and consented to Timm's subsequent disposition of the funds from those CDs. This finding is supported by evidence in the record and is not clearly erroneous.

[¶44.]     After Thacker entered the nursing home, Timm arranged that funds from Thacker's retirement account would be transferred monthly to their joint checking account to pay his nursing home expenses. Hanson conceded at trial that the funds transferred from the retirement account were used to pay Thacker's nursing home expenses. The circuit court found that Timm had no improper purpose in accomplishing those transfers. This finding is supported by evidence in the record and is not clearly erroneous. We affirm the circuit court's determination that no conversion occurred.

### 5. Whether the circuit court abused its discretion when it determined that the joint bank accounts were not implied trusts.

[¶45.]     South Dakota courts will use an implied trust "as a remedial device to restore the status quo and is therefore utilized when 'a person owning title to property is under an equitable duty to convey it to another because he would be unjustly enriched if he were permitted to retain it.'" *Banner Health Sys. v. Long*, 2003 S.D. 60, ¶ 26, 663 N.W.2d 242, 247 (quoting *Knock v. Knock*, 80 S.D. 159, 166, 120 N.W.2d 572, 576 (1963)). "An implied trust arises from the facts and circumstances of a transaction. A trust by operation of law must be established by clear, satisfactory, and convincing evidence." *DFA Dairy Fin. Servs., L.P. v. Lawson Special Tr.*, 2010 S.D. 34, ¶ 32, 781 N.W.2d 664, 672 (citation omitted) (quoting *Noll v. Brende*, 318 N.W.2d 319, 320 (S.D. 1982)).

[¶46.]     The Estate acknowledges that it must prevail on one of the preceding issues to create circumstances requiring the imposition of an implied trust. Because it has not, we affirm the circuit court's denial of the Estate's request for the creation of an implied trust.

[¶47.]     We affirm the circuit court on all issues.

[¶48.]     JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.