#29823, #29830-aff in pt & rev in pt-SRJ
**2023 S.D. 23**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ESTATE OF ROBERT T. LYNCH,
Deceased,

Plaintiff, Counter-Defendant,
and Appellant,

v.

KEVIN LYNCH,

Defendant, Counter-Plaintiff,
and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CLAY COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE TAMI BERN
Judge

\* \* \* \*

MICHAEL J. SCHAFFER of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota

Attorneys for plaintiff, counter-
defendant, and appellant.

RONALD A. PARSONS, JR.
PAMELA R. REITER
SARA E. SHOW of
Johnson Janklow Abdallah
    & Reiter LLP
Sioux Falls, South Dakota

Attorneys for defendant,
counter-plaintiff, and appellee.

\* \* \* \*

ARGUED
OCTOBER 4, 2022
OPINION FILED **05/17/23**

#29823, #29830

JENSEN, Chief Justice

[¶1.]	The Estate of Robert T. Lynch (the Estate) sued Kevin Lynch alleging claims for fiduciary fraud, conversion, breach of fiduciary duty, and elder exploitation arising from Kevin's management of his father Robert's (Bob) finances and farm operation prior to Bob's death. Kevin answered and filed a counterclaim against the Estate for conversion, among other claims. The circuit court denied the Estate's motion for partial summary judgment on its claims against Kevin. At trial, a jury returned a verdict for Kevin on the Estate's claims, and the court entered judgment as a matter of law for Kevin on his counterclaim for conversion.

[¶2.]	The Estate appeals, arguing that the circuit court erred by denying its motion for partial summary judgment, and that the court erred at trial in permitting Kevin to introduce oral extrinsic evidence responsive to the Estate's claims for self-dealing, in instructing the jury, and in granting Kevin's motion for judgment as a matter of law on his claim for conversion. In the event we reverse and remand, Kevin seeks review of the circuit court's ruling that the power of attorney naming Kevin as Bob's attorney-in-fact (POA) did not expressly authorize self-dealing and of the court's refusal to give his proposed jury instruction providing for a credit against any damages awarded for gifts authorized by the POA.[1] We affirm in part, reverse in part, and remand.

---

1.	Based upon our resolution of the Estate's first issue, it is unnecessary to consider Kevin's notice of review issue separately.

-1-

## Facts and Procedural History

[¶3.]    Bob was born on March 13, 1932. He had four children with his wife, Mary Imelda Lynch: Carleen, LaCarla Annette (Ann), Glenda, and Kevin. Bob was predeceased by Mary and Glenda. Bob was a lifelong farmer. He owned and operated a successful crop and cattle operation on approximately 675 acres of farmland near Vermillion. Kevin joined his father in the farming operation after he reached adulthood, while Carleen and Ann pursued other professional endeavors outside South Dakota. Bob and Kevin farmed together in an arrangement that evolved over the years as Kevin took on increased responsibilities. When Bob retired from farming in 1995, Kevin took over the operation, but Bob continued to own the land and most of the stock cows. Bob and Kevin agreed that Kevin would assume a 60% share of the expenses and income from the crops and cattle, while Bob would assume a 40% share of the same. As part of the arrangement, Kevin used Bob's equipment. Bob moved off the farm in 2006 and began living with his long-time friend, Patty.

[¶4.]    Bob had a stroke in 2007 that primarily impacted his physical mobility. On December 5, 2007, Bob appointed Kevin as his attorney-in-fact under the POA.[2] On February 1, 2008, Bob completed separate paperwork with his bank

---

2.    The POA authorized Kevin to make gifts, including gifts to himself:

> To make gifts of my real or personal property or my interest in such property (including, but not limited to, outright gifts, . . .) to such persons (including my attorney) or institutions, in such amounts or proportions, as my attorney, in his, her, or its sole discretion and judgment, may deem appropriate for tax or other reasons; provided, however, the total value of gifts to any one
>
> (continued . . .)

that authorized Kevin to sign checks on his checking account under a power of attorney. On May 13, 2008, Bob went to the bank and changed the checking account to a joint ownership account with Kevin. The joint ownership form Bob signed included language giving Kevin a right of survivorship upon Bob's death.

[¶5.] On March 1, 2010, Bob executed a Will. The Will gave 51% of his farm real estate to Kevin, with his surviving daughters each receiving a 24.5% share. Kevin was also given a right of first refusal if his sisters wished to sell the land. The Will further gave all of Bob's farm machinery, equipment, grain, and livestock to Kevin, along with his pickup and truck. The remainder of Bob's estate was to be split between the three surviving children share and share alike, "including all of my cash assets including certificates of deposit, savings accounts, and checking accounts." Bob stated in his Will the reasons for the disposition of his property:

> In this my Last Will and Testament I have benefitted my son Kevin J. Lynch over my two daughters. I do this because he stayed home to help me on the farm. He has also helped me considerably in my problems in daily living as I have aged. I further have the specific intention of continuing on the farming heritage in the Lynch family. For these reasons I have provided more to my son Kevin J. Lynch than to the other children.

The Will designated Kevin and Ann as co-personal representatives of his estate.

[¶6.] Bob's physical condition continued to deteriorate. It became more difficult for Patty to care for Bob in the home as he moved from using a walker into a wheelchair. He entered a nursing home in September 2011. The notes from the nursing home, at various times, indicate Bob had some cognitive impairment,

_____

(. . . continued)
donee in any calendar year shall not exceed (i) the amount specified for the federal gift tax annual exclusion[.]

including occasional confusion, short-term memory loss, and inability to recall the day, month, and year. Kevin testified that Bob had some bad days, but most days he could converse and knew what was going on at the farm.

[¶7.]      To ensure adequate income to pay his nursing home expenses, Bob began receiving rent for leasing his cropland to a local farmer in 2012 on a cash rent basis.[3] Kevin testified Bob agreed to begin paying him $30,000 annually to maintain the farmstead and non-tillable acres because Kevin was no longer farming the cropland and receiving 60/40 share rental income. Kevin also claimed that he and Bob agreed Kevin would continue to handle the duties associated with the cattle operation and modified the compensation arrangement so Kevin would receive all the income from the sale of the cattle produced each year while Bob paid the expenses of the cattle operation.

[¶8.]      After Bob began residing in the nursing home, Kevin issued and signed checks totaling $398,000 from the joint checking account payable directly to himself and deposited the funds into his personal checking account. Kevin testified that $210,000 consisted of the annual $30,000 compensation that Bob agreed to pay Kevin. Kevin further testified that $145,000 was used to pay equipment loans and farm indebtedness Kevin was no longer able to pay after Bob began cash renting his cropland. Kevin testified that Bob made the decision to pay off these loans to ensure Kevin could continue a viable farming operation into the future. Kevin

---

3.     Bob received cash rent of approximately $160,000 annually. His annual nursing home expenses increased each year from approximately $70,000 to $87,000 until his death. After deducting farm expenses, including depreciation, Bob's annual taxable income between 2012 and 2017 far exceeded his nursing home and personal expenses.

testified that the remaining $43,000 consisted of $17,000 in additional compensation; $16,000 for reimbursement of other farm-related expenses Kevin paid, such as repairing the roof on Bob's farmhouse; and $10,000 that Kevin mistakenly withdrew from the joint account and later reimbursed to Bob. Kevin claimed that each of these transactions was discussed and approved by Bob.

[¶9.]        Kevin also issued checks from the joint account in the amount of $106,774.62 for Morton buildings constructed on land Kevin owned and $104,514.20 to purchase machinery and equipment that Kevin would inherit under the Will. Kevin testified that each purchase was discussed with Bob and approved by him. Kevin explained that Bob supported locating new Morton buildings on Kevin's property because the machine sheds on Bob's property had dirt floors and were in low spots that would at times flood. Kevin also testified to his own belief that the Morton buildings constructed on his property belonged to the Estate.[4] He further testified that it was necessary to continue to upgrade the farm equipment to maintain the farm, despite the cash rental arrangement. Even though Kevin had discussed parts of the Will with his sister before Bob died, Kevin testified that he was unaware he would receive the farm equipment until after Bob died.

[¶10.]        Consistent with Kevin's testimony about the modified cattle arrangement after Bob went into the nursing home, Kevin also paid for most of the cattle operation expenses from the joint account from 2011 until Bob's death. The

---

4.        The circuit court made no determination on the ownership of the Morton buildings, and it is unknown if Kevin's testimony that the Estate owned the buildings was considered by the jury in arriving at its verdict. We do not consider this question to be before this Court on appeal.

Estate presented evidence that Kevin paid $93,401 from the joint account for cattle feed during this time and purchased $60,000 in stock cattle for Bob.[5] Kevin used $17,000 of his own money to purchase two bulls and another $13,510 to purchase cattle feed after 2011. From 2011 until Bob's death, Kevin received all the income from the sale of cattle, which totaled $147,841.

[¶11.] Apart from the checks written by Kevin from the joint account, Kevin used the POA to withdraw money from several of Bob's retirement accounts (IRAs), certificates of deposit (CDs), and a money market account, totaling $322,539.89. Kevin deposited most of these funds into the joint account, except for two CDs, totaling $44,590.22, that Kevin withdrew and deposited directly into his personal checking account in 2012. Both CDs were owned by Bob, designated Kevin as the payable-on-death beneficiary, and had a maturity date in 2013. Kevin used the funds from these two CDs to buy a new mid-sized pickup, which he titled in his name. Kevin explained that he bought the smaller pickup to replace Bob's larger pickup because it was difficult for Bob to get into the larger pickup to ride with Kevin around the farm. Kevin testified that Bob approved this purchase.

[¶12.] Bob died on March 13, 2018. At the time of Bob's death, the joint bank account had a balance of $112,296.13, $110,000 of which Kevin transferred to the Estate at Ann's direction. Ann petitioned to have Kevin removed as personal

---

5. Bob owned approximately 2/3 of the stock cattle while Kevin owned approximately 1/3. In order to keep the stock cattle numbers consistent, Kevin testified that he purchased the additional cattle for Bob to replace cows that were culled from the operation after they became unproductive. Kevin apparently received the money for Bob's cull cows that were sold since Bob did not receive any cattle income after 2011.

representative based upon her claim that Kevin had breached fiduciary duties owed to Bob while acting as his attorney-in-fact. Kevin agreed to the entry of an order removing him as co-representative until the Estate's claims were resolved.

[¶13.] On August 23, 2018, the Estate sued Kevin, claiming fiduciary fraud, breach of fiduciary duty, conversion, and elder exploitation. The Estate sought both actual and punitive damages. Kevin counterclaimed for conversion of the $110,000 Kevin had transferred to the Estate from the joint account. Kevin also alleged he was entitled to claims for setoff, unjust enrichment, and quantum meruit for labor and expenses provided to Bob and the Estate, if he was required to repay any money he received from the joint account or CDs. Kevin also alleged a third-party complaint against Ann, in her capacity as personal representative, which was later dismissed by stipulation.

[¶14.] The Estate and Kevin both moved for partial summary judgment. The Estate argued in its motion that it was entitled to judgment as a matter of law on its claims for fiduciary fraud, breach of fiduciary duty, and conversion because there was no written documentation authorizing Kevin's self-dealing transactions as fiduciary for Bob and the oral extrinsic evidence offered by Kevin concerning Bob's approval of the challenged transactions was inadmissible under *Bienash v. Moller*, 2006 S.D. 78, 721 N.W.2d 431. Kevin moved for summary judgment on his counterclaim for conversion against the Estate. He also moved for summary judgment on most of the self-dealing claims, arguing that the Estate had failed to

present evidence of improper self-dealing or any damage the Estate suffered.[6] Kevin additionally argued the Estate's claims prior to March 2012 were barred by the statute of limitations and that there was no recognized claim for elder exploitation prior to July 1, 2016.

[¶15.] The circuit court held a hearing on the parties' motions and subsequently issued an oral ruling denying the Estate's motion in its entirety, determining that genuine issues of material fact existed as to whether Kevin engaged in improper self-dealing. The circuit court distinguished *Bienash*, reasoning "it does not necessarily follow that any act of self-dealing is also a breach of fiduciary duty[,]" because the expenditures benefitted Bob and were not just gifts to himself. The court also cited *Hein v. Zoss*, 2016 S.D. 73, 887 N.W.2d 62, in determining that evidence of the business arrangement between Kevin and Bob for the operation of the farm was admissible to allow the jury to consider whether Kevin acted in good faith and for the benefit of Bob in the transactions at issue.

[¶16.] The court determined genuine issues of material fact existed on Kevin's counterclaim for conversion and whether Bob intended to create a joint account with rights of survivorship for Kevin. The court granted Kevin's motion to dismiss the claims of elder exploitation alleged to have occurred prior to July 1, 2016, but denied the remainder of Kevin's motion, determining that questions of fact existed on the self-dealing claims and whether the Estate sustained damage.

---

6. Kevin argued that the Estate did not sustain any damage because Bob owned the joint account until his death, when the joint account passed to Kevin by operation of law.

[¶17.]     Prior to trial, the Estate moved in limine under *Bienash* to exclude any oral extrinsic evidence from Kevin concerning any alleged agreements or authorization from Bob permitting Kevin to self-deal while acting as his attorney-in-fact.  The court denied the motion and determined that evidence of discussions between Bob and Kevin was admissible for the same reasons the court gave at the time of its summary judgment ruling.

[¶18.]     At trial, Kevin presented evidence, over the Estate's objections, that all the challenged transactions were intended as compensation or were a part of the longstanding farm arrangement between Bob and Kevin.  Kevin testified to Bob's approval of each of the purchases made by Kevin over the years.  At the close of evidence, the circuit court denied the Estate's motion for judgment as a matter of law on its claims but granted Kevin's motion for judgment as a matter of law on his counterclaim for conversion in the amount of $110,000.

[¶19.]     During the settlement of the jury instructions, the Estate objected to several of the circuit court's instructions, including number 15, instructing the jury to determine whether Kevin owed Bob a fiduciary duty for any transactions outside the scope of the POA.  The court also refused to give the Estate's requested jury instruction number 31, explaining breach of fiduciary duty.

[¶20.]     The jury returned verdicts for Kevin on the Estate's claims against him.[7]  The circuit court entered a judgment for Kevin on the Estate's claims.  Based

---

7.     The jury marked "Defendant Kevin Lynch" in response to these questions:

> (1) Do you find in favor of Plaintiff or Defendant on the Plaintiff's claim of Breach of Fiduciary Duty?

(continued . . .)

upon its judgment as a matter of law ruling, the court entered a judgment against

the Estate in the amount of $110,000 on Kevin's counterclaim for conversion.

[¶21.]     The Estate appeals and raises several issues, which we restate as

follows:

1.    Whether the circuit court abused its discretion in allowing
      Kevin to introduce oral extrinsic evidence at summary
      judgment and at trial to defend the claims of improper
      self-dealing and erred in denying the Estate's motion for
      partial summary judgment.

2.    Whether the circuit court erred in refusing the Estate's
      proposed jury instruction number 31 and giving jury
      instruction number 15.[8]

3.    Whether the circuit court erred in granting Kevin's
      motion for judgment as a matter of law on his
      counterclaim for conversion against the Estate.

---

(. . . continued)
       (2) Do you find in favor of Plaintiff or Defendant on the
       Plaintiff's claim of Conversion?
       (3) Do you find in favor of Plaintiff or Defendant on the
       Plaintiff's claim of Elder Exploitation?

       After resolving the question of liability in favor of Kevin on all the claims, the
       jury did not reach the questions of damages or the counterclaims for setoff
       asserted by Kevin.

8.    The Estate also argues that the circuit court erred by giving instructions
      number 23, 29, 30, and 31, the first three of which pertained to
      considerations for the jury on the claims for breach of fiduciary duty and
      affirmative defenses to claims of breach of fiduciary duty.  The instructions
      contained proper statements of the law.  Given our determination that oral
      extrinsic evidence was admissible on the claims arising from the joint
      account, the court did not err in giving these instructions.  Number 31
      instructed the jury on Kevin's right to recoup damages or expenses Kevin
      incurred if the Estate was awarded damages.  This issue is rendered moot by
      our resolution of the case.

## Analysis and Decision

### 1. *Admissibility of oral extrinsic evidence and denial of summary judgment.*

#### a. Standard of review.

[¶22.] "We review a grant or denial of summary judgment de novo. Summary judgment is proper where . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Sheard v. Hattum*, 2021 S.D. 55, ¶ 22, 965 N.W.2d 134, 141 (internal citation and citation omitted). "Evidentiary rulings made by the trial court are presumed correct and are reviewed under an abuse of discretion standard." *Hein*, 2016 S.D. 73, ¶ 7, 887 N.W.2d at 65 (quoting *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 16, 721 N.W.2d 438, 443). Additionally, "[a] court's evidentiary rulings in summary judgment proceedings are reviewed for an abuse of discretion." *Blanchard v. Mid-Century Ins. Co.*, 2019 S.D. 54, ¶ 17, 933 N.W.2d 631, 636. "With regard to the rules of evidence, abuse of discretion occurs when a trial court misapplies a rule of evidence, not when it merely allows or refuses questionable evidence." *Ruschenberg v. Eliason*, 2014 S.D. 42, ¶ 23, 850 N.W.2d 810, 817 (quoting *JAS Enters., Inc. v. BBS Enters., Inc.*, 2013 S.D. 54, ¶ 21, 835 N.W.2d 117, 125). "An evidentiary ruling will not be overturned unless error is demonstrated and shown to be prejudicial error. Error is prejudicial when, in all probability it produced some effect upon the final result and affected rights of the party assigning it." *Hein*, 2016 S.D. 73, ¶ 7, 887 N.W.2d at 65 (quoting *Behrens v. Wedmore*, 2005 S.D. 79, ¶ 63, 698 N.W.2d 555, 579).

### b.    Admissibility of oral extrinsic evidence.

[¶23.]    The Estate relies upon the bright-line rule from *Bienash* in support of its claim that Kevin breached his fiduciary duty to Bob, as a matter of law, by engaging in improper self-dealing while acting as attorney-in-fact under the POA. The Estate argues that the circuit court improperly considered oral extrinsic evidence to find that questions of fact existed at summary judgment and erred in admitting this evidence at trial.

[¶24.]    In considering the Estate's claims, we first review our rule from *Bienash* and cases since *Bienash*. *Bienash* "adopt[ed] a bright-line rule that no *oral* extrinsic evidence will be admitted to raise a factual issue" when an attorney-in-fact acting under the authority of a power of attorney engages in self-dealing. 2006 S.D. 78, ¶ 24, 721 N.W.2d at 437. In adopting this rule, *Bienash* looked to other jurisdictions. *Id.* ¶¶ 17–23, 721 N.W.2d at 435–37 (citing *Crosby v. Luehrs*, 669 N.W.2d 635, 644 (Neb. 2003) (holding no authority to self-deal unless authorized in instrument); *Kunewa v. Joshua*, 924 P.2d 559, 565 (Haw. Ct. App. 1996) (forbidding any extrinsic evidence of authority to self-deal); *Praefke v. Am. Enter. Life Ins.*, 655 N.W.2d 456, 459 (Wis. 2002) (same)). Quoting *Kunewa*, we explained the rationale for the rule:

> When one considers the manifold opportunities and temptations for self-dealing that are opened up for persons holding general powers of attorney—of which outright transfers for less than value to the attorney-in-fact [himself or] herself are the most obvious—the justification for such a flat rule is apparent. And its justification is made even more apparent when one considers the ease with which such a rule can be accommodated by principals and their draftsmen.

*Bienash*, 2006 S.D. 78, ¶ 21, 721 N.W.2d at 436 (alteration in original).

[¶25.]     The Court also relied upon existing South Dakota decisional law explaining that "a power of attorney must be strictly construed . . . ." *Id.* ¶ 13, 721 N.W.2d at 435 (quoting *In re Guardianship of Blare*, 1999 S.D. 3, ¶ 14, 589 N.W.2d 211, 214). An attorney-in-fact acting under the authority of a power of attorney may only "self-deal . . . if the power of attorney provides 'clear and unmistakable language' specifically authorizing acts of self-dealing." *Estate of Stoebner v. Huether*, 2019 S.D. 58, ¶ 19, 935 N.W.2d 262, 267–68 (quoting *Bienash*, 2006 S.D. 78, ¶ 14, 721 N.W.2d at 435). "*[O]nly those powers specified in the document* are granted to the attorney-in-fact." *Bienash*, 2006 S.D. 78, ¶ 13, 721 N.W.2d at 435 (alteration in original) (quoting *In re Guardianship of Blare*, 1999 S.D. 3, ¶ 14, 589 N.W.2d at 214). "Thus, if the power to self-deal is not specifically articulated in the power of attorney, that power does not exist." *Id.* ¶ 14, 721 N.W.2d at 435.

[¶26.]     Since our decision in *Bienash*, this Court has reaffirmed the rule that, in the absence of express written authority, oral extrinsic evidence is not admissible to show that the principal approved a transaction benefitting an attorney-in-fact acting under the authority of a power of attorney. *See, e.g.*, *Estate of Stoebner*, 2019 S.D. 58, ¶ 23, 935 N.W.2d at 268; *Studt v. Black Hills Fed. Credit Union*, 2015 S.D. 33, ¶ 14, 864 N.W.2d 513, 517. We have likewise reaffirmed the rule that an attorney-in-fact acts in a fiduciary capacity, as a matter of law, in any transaction in which a power of attorney is used. *Johnson v. Markve*, 2022 S.D. 57, ¶ 70, 980 N.W.2d 662, 680; *Estate of Stoebner*, 2019 S.D. 58, ¶ 17, 935 N.W.2d at 267; *Hein*, 2016 S.D. 73, ¶ 8, 887 N.W.2d at 65.

[¶27.] However, we have cabined the *Bienash* evidentiary rule in three important ways. First, in *Hein*, we held that *Bienash* does not exclude oral extrinsic evidence of approval and authorization of continuing transactions that benefit the attorney-in-fact and began prior to the existence of a power of attorney. 2016 S.D. 73, ¶ 12, 887 N.W.2d at 67. At issue in *Hein* was "whether [the attorney-in-fact] acted with utmost good faith and in [the principal's] interest when he continued to rent [her] land [on favorable terms] in the same manner as he had before he became her attorney-in-fact." *Id.* Under *Bienash*, the circuit court disallowed oral extrinsic evidence that the principal approved the favorable rental arrangement after the power of attorney was executed. On appeal, *Hein* held "[t]his evidence was relevant to show whether [the attorney-in-fact] acted with utmost good faith and for the benefit of [the principal], and its omission prejudiced [the attorney-in-fact]. Therefore the court abused its discretion by excluding it." *Id.* ¶ 13.

[¶28.] Second, we have recognized that some acts by an attorney-in-fact, after a power of attorney has been executed, may be outside the fiduciary relationship created by the power of attorney and not subject to the bright-line evidentiary rule. In *Estate of Bronson*, we considered the amanuensis doctrine, which provides "that where the name of a party is signed to an instrument in the presence of the party, and by his authority, and where he knows the contents of the same, the signature will be regarded as the signature of the party whose name purports to be signed to the instrument[.]" 2017 S.D. 9, ¶ 10, 892 N.W.2d 604, 608 (quoting *Hickox v. Bacon*, 17 S.D. 563, 97 N.W. 847, 847 (1903)). We held that "[a]pplying only the laws of agency and fiduciary self-dealing in a case like this would create an irrebuttable

presumption that once a power of attorney is granted, every subsequent act of the attorney-in-fact involves a fiduciary duty of that agent—even if it is an act regarding a matter unconnected to the agency." *Id.* ¶ 11. In *Estate of Bronson,* "none of the factors[9] necessary for a fiduciary relationship were present in [the] banking transaction. The evidence undisputedly indicate[d] that [the principal] was independently and competently handling his own financial affairs when he went to the bank to request the creation of the joint account." *Id.* ¶ 11, 892 N.W.2d at 609.

[¶29.] Since *Estate of Bronson,* we have clarified that when an attorney-in-fact uses the power of attorney to carry out an act, the *Bienash* rule applies without a separate showing on the presence of the traditional factors. *See Estate of Stoebner*, 2019 S.D. 58, ¶ 18, 935 N.W.2d at 267. In *Estate of Stoebner v. Huether*, an attorney-in-fact sold the principal's land to himself for a price lower than the values estimated in an appraisal and a board of equalization assessment after allegedly discussing alternatives with the principal. *Id.* ¶¶ 5–7, 935 N.W.2d at 264–65. The attorney-in-fact owed the principal a fiduciary duty and engaged in

---

9. In *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 838 (S.D. 1990), we adopted factors to aid in determining the existence of a fiduciary relationship from an old Indiana appellate decision, *Yuster v. Keefe*, 90 N.E. 920 (Ind. App. 1910):

> There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other*.

We have cited these factors frequently. *See, e.g.*, *Estate of Thacker v. Timm*, 2023 S.D. 2, ¶ 21, 984 N.W.2d 679, 687 (quoting *Wyman v. Bruckner*, 2018 S.D. 17, ¶ 28, 908 N.W.2d 170, 179).

improper self-dealing as a matter of law because he used the power of attorney to carry out the sale. *Id.* ¶ 27, 935 N.W.2d at 270.

[¶30.]     Third, we have declined to expand *Bienash* to prohibit oral extrinsic evidence of authorization to self-deal for fiduciary agency relationships arising outside the power of attorney relationship. *See Smith Angus Ranch, Inc. v. Hurst*, 2021 S.D. 40, ¶¶ 23–24, 962 N.W.2d 626, 631–32 (holding oral extrinsic evidence of corporate fiduciary's authorization to self-deal was admissible even though the organizational documents did not expressly provide such authorization). "Limiting the rule to acts of self-dealing by POAs is consistent with the recognition of this Court, and other courts, that the rule arises from the acute vulnerability of POAs to self-dealing." *Id.* ¶ 22, 962 N.W.2d at 631.

[¶31.]     The Estate argues that Kevin was acting in a fiduciary capacity under the POA at all relevant times and breached his fiduciary duty by engaging in transactions from which he directly benefitted. In the Estate's view, Kevin was not expressly authorized by the POA to self-deal, and the oral extrinsic evidence Kevin offered concerning the challenged transactions was inadmissible. The Estate argues that the circuit court abused its discretion by permitting Kevin to offer this evidence to resist the Estate's motion for summary judgment and at trial to justify his self-dealing.

[¶32.]     In response to the Estate's claim, Kevin argues that *Bienash* is inapplicable for a variety of reasons, including that (1) the challenged transactions were a part of the longstanding farming arrangement that preexisted the POA; (2) the POA authorized Kevin to make annual gifts to himself; and (3) most of the

checks were written by Kevin from the joint account and did not involve the use of the POA. Kevin also claims that he did not self-deal because these transactions benefitted Bob and furthered Bob's desire to continue the farm operation through Kevin.

[¶33.] The record is undisputed that Kevin used the POA to cash in several CDs, IRAs, and a money market account held by Bob, totaling $322,539.89. However, except for $44,590.22 that Kevin deposited into his personal account to purchase a pickup, he deposited all the proceeds from these accounts into the joint account. The Estate has not asserted a claim against Kevin for his use of the POA to cash in the CDs, IRAs, and money market funds owned by Bob that he then deposited into the joint account. As to the CDs, instruction number 33 specifically informed the jury that "[The Estate's] claim for damages are for two CDs in the total sum of $44,590.22. [The Estate] is not seeking to recover damages for any other CDs that were received into evidence[.]"

[¶34.] Based upon one isolated question and answer from Kevin's testimony, the Estate argues that he was acting under the authority of the POA while writing checks from the joint account.[10] However, Kevin never used the POA to write checks or manage the joint account as his status as a joint account holder permitted him to issue checks from the account. This Court has recognized that the question of whether an individual is acting under the authority of a power of attorney or as a joint account owner is generally one of law, not fact. *See Wyman v. Bruckner*, 2018

---

10. During questioning by the Estate's attorney, Kevin was asked, "When you disbursed money from his checking account, you were acting as his power of attorney[?]" Kevin answered, "Correct."

S.D. 17, ¶ 15, 908 N.W.2d 170, 176. The Estate's claim that Kevin was acting under the authority of the POA to manage the joint account is not supported legally or factually on this record.

[¶35.] We have never extended the *Bienash* rule to transactions that involve self-dealing by an attorney-in-fact acting outside the agency relationship created by the power of attorney, and the Estate does not ask us to extend *Bienash* to a fiduciary managing funds presumptively owned by a principal in a joint account. *See* SDCL 29A-6-103(1) ("A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."). Given the limits of the evidentiary rule in *Bienash*, the circuit court did not abuse its discretion in determining that oral extrinsic evidence was relevant and admissible to Kevin's management and use of the joint account, all of which was accomplished without using the authority conferred in the POA. The jury considered all the transactions at issue that arose from the joint account and returned verdicts for Kevin on the Estate's claims for breach of fiduciary duty, conversion, and elder exploitation.

[¶36.] In contrast, the Estate's claim arising from Kevin's use of the POA to cash in the two CDs totaling $44,590.22, which Kevin deposited in his personal account, does implicate *Bienash*. Kevin argues, however, that *Bienash* does not apply because he was expressly authorized to make gifts to himself under the POA. Alternatively, he argues, at a minimum, he is entitled as a matter of law to a credit up to the maximum annual federal gifting limits against any damages arising from

alleged self-dealing. The Estate points to Kevin's testimony that he never used this gifting provision while he was acting as attorney-in-fact for Bob under the POA. It argues that "[a] party to a lawsuit cannot claim the benefit of a version of relevant facts more favorable to his own contentions than he has given in his own testimony." *J. Clancy, Inc. v. Khan Comfort, LLC*, 2021 S.D. 9, ¶ 22, 955 N.W.2d 382, 390 (quoting *Law Capital, Inc. v. Kettering*, 2013 S.D. 66, ¶ 13, 836 N.W.2d 642, 646).

[¶37.]     Regardless of Kevin's belief about whether the money was a gift, in considering the Estate's claim for breach of fiduciary duty, the relevant question under *Bienash* was Kevin's authority to act under the POA. The interpretation of the POA is a question of law, not fact. *See Wyman*, 2018 S.D. 17, ¶ 9, 908 N.W.2d at 174 (quoting *Estate of Lien v. Pete Lien & Sons, Inc.*, 2007 S.D. 100, ¶ 10, 740 N.W.2d 115, 119) ("Cases involving the interpretation of written documents are particularly appropriate for disposition by summary judgment, such interpretation being a legal issue rather than a factual one."). "[W]e must look to the extent of [the attorney-in-fact's] authority under the power of attorney to determine whether [the attorney-in-fact] breached his fiduciary duty." *Estate of Stoebner*, 2019 S.D. 58, ¶ 19, 935 N.W.2d at 267. "In order for self-dealing to be authorized, the instrument creating the fiduciary duty must provide 'clear and unmistakable language' authorizing self-dealing acts." *Bienash*, 2006 S.D. 78, ¶ 14, 721 N.W.2d at 435 (citation omitted).

[¶38.]     The POA expressly authorized Kevin "[t]o make gifts of my real or personal property . . . to such persons (including my attorney) or institutions, in

such amounts or proportions, as my attorney, in his, her, or its sole discretion and judgment, may deem appropriate for tax or other reasons[.]" Through the POA, Bob provided Kevin with unfettered discretion to give himself an amount up to the annual federal gift tax exclusion. In 2012 the gift tax exclusion was $13,000.[11] However, Kevin exceeded his express authority under the POA by withdrawing both CDs in 2012, totaling $44,590.22, and depositing the funds into his personal account to purchase a pickup. Any damage claim for breach of fiduciary duty would be properly offset by the specifically authorized annual gift tax exclusion amount of $13,000.

[¶39.]     Nevertheless, Kevin argues that the circuit court properly applied the *Hein* exception permitting oral extrinsic evidence of the long-standing farming arrangement between Bob and Kevin that preexisted the use of the POA. Kevin's attempt to apply *Hein* so broadly on this record is untenable. His use of the POA to cash in the payable-on-death CDs to purchase a pickup was a discrete transaction that had not previously been part of their course of dealing or part of the farming arrangement over the years.

[¶40.]     Kevin also argues that *Bienash* has no application because this transaction did not involve improper self-dealing as the purchase of the pickup benefitted Bob by allowing Kevin to transport him more easily between the nursing home and farm. While Kevin's testimony that he purchased a smaller pickup for Bob's benefit may not have been the kind of oral extrinsic evidence prohibited by

---

11.     *See* 26 U.S.C.A. § 2503(b) (West 2023) (providing baseline amount of annual exclusion from gift tax and formula for inflation adjustment).

*Bienash*, the evidence did not create a genuine issue of material fact on the Estate's claim for breach of fiduciary duty. The impermissible self-dealing claim did not arise from Kevin's decision to purchase a new pickup to replace Bob's larger pickup. Rather, it arose from Kevin's decision to purchase the new pickup by cashing in Bob's CDs and using the money to purchase a pickup titled in Kevin's name. In the absence of oral extrinsic evidence, which was precluded by *Bienash*, this is exactly the kind of self-dealing by an attorney-in-fact acting under a power of attorney that is prohibited by our caselaw. *See Smith Angus Ranch, Inc.*, 2021 S.D. 40, ¶ 16, 962 N.W.2d at 630; *see also In re Estate of Stevenson*, 2000 S.D. 24, ¶ 11, 605 N.W.2d 818, 821 ("[T]here is a general rule against self-dealing."). Although Kevin was authorized to give himself a maximum of $13,000 in 2012, for any reason, his effort to offer oral extrinsic evidence that Bob had approved the remaining $31,590.22 that exceeded this authority under the POA was precluded by *Bienash*. Thus, the circuit court should have determined as a matter of law that Kevin engaged in impermissible self-dealing.

[¶41.] Finally, Kevin argues that, even if he breached his fiduciary duty to Bob, the Estate did not sustain any damage because the CDs were payable to Kevin upon Bob's death and Kevin would have inherited the pickup under the Will if he had purchased it in Bob's name. While Kevin may have inherited the pickup if it had been purchased in Bob's name, the damage to the Estate was the unauthorized withdrawal of $31,590.22 from the CDs. The payable-on-death designation on the CDs did not create an inter vivos gift; Bob could have changed the payable-on-death status at any time. *See* SDCL 43-3-6 ("A mere possibility, such as the expectancy of

an heir apparent, is not deemed an interest of any kind."); *see also Briggs v. Briggs*, 2019 S.D. 37, ¶ 22, 931 N.W.2d 510, 515 ("[A] testator may, up to the moment of death, revise and amend the disposition of the estate, and a prospective beneficiary's right to inherit depends on the decedent's final testamentary disposition in favor of that beneficiary."). The CDs matured in 2013, and there was no testimony concerning Bob's intended disposition of the funds thereafter. On this record, a jury could only speculate concerning Bob's disposition of these funds and whether Kevin would have been entitled to receive the $31,590.22 at the time of Bob's death. Therefore, the Estate is entitled to recover the amount of damages Bob sustained on the day that Kevin impermissibly withdrew the money from the CDs.

[¶42.] We reverse the circuit court's denial of summary judgment on the Estate's claim involving Kevin's use of the POA to cash in the CDs, less a credit for the express authorization permitting Kevin to gift himself $13,000 in 2012. On the remaining claims of the Estate, we find no abuse of discretion in the admission of oral extrinsic evidence on the claims arising from Kevin's use of the joint account, and the circuit court did not err in denying the Estate's motion for partial summary judgment on these claims.

### 2. *Jury instructions on fiduciary duty and breach.*

[¶43.] The Estate argues that the circuit court erred by declining to give its proposed jury instruction number 31 and by giving jury instruction number 15. We review jury instructions and refusal to give proposed jury instructions for abuse of discretion. *Behrens*, 2005 S.D. 79, ¶ 57, 698 N.W.2d at 578. "Error occurs if, as a whole, the instructions misled, conflicted, or caused confusion." *State ex rel. Dep't of*

*Transp. v. Miller*, 2016 S.D. 88, ¶ 32, 889 N.W.2d 141, 152. For such error to be reversible, "the party challenging the instruction must show that 'in all probability it produced some effect upon the verdict' and harmed that party's substantial rights." *Id.* (citing *Behrens*, 2005 S.D. 79, ¶ 37, 698 N.W.2d at 570).

[¶44.] The circuit court did not err in refusing to give instruction number 31. Instruction number 31 provided that "[a] fiduciary breaches his fiduciary duty when he uses his position by enriching the value of property that would eventually devolve to him." This instruction was an inaccurate statement of the law. The proposed instruction would have effectively imposed a rule under which the jury was required to find a breach of fiduciary duty by Kevin if any of the transactions resulted in enhancing the value of any property he would eventually receive under the Will. But no such definitive rule exists, and instead we generally regard the question of whether a fiduciary duty has been breached as a fact question. *Bienash*, 2006 S.D. 78, ¶ 12, 721 N.W.2d at 434.

[¶45.] The court properly instructed the jury that "[a] fiduciary duty obligates the fiduciary to act in the utmost good faith for the benefit and in the best interest of the other party in the course of the fiduciary relationship, and to refrain from obtaining any advantage at that person's expense. The fiduciary must refrain from any act of self-dealing not authorized by the power of attorney." Disputed issues of fact existed as to whether any of the expenditures made by Kevin from the joint account were improper and a breach of any fiduciary duty Kevin may have owed to his father.

[¶46.] "The existence of a fiduciary duty and the scope of that duty are questions of law for the court." *Ward v. Lange*, 1996 S.D. 113, ¶ 12, 553 N.W.2d 246, 250 (quoting *High Plains Genetics Rsch., Inc. v. JK Mill-Iron Ranch*, 535 N.W.2d 839, 842 (S.D. 1995)). We have identified factors for determining whether a fiduciary relationship has arisen:

> A fiduciary relationship is founded on a "peculiar confidence" and trust placed by one individual in the integrity and faithfulness of another. When such relationship exists, the fiduciary has a "duty to act primarily for the benefit" of the other. "Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." South Dakota law reflects "the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit. The law will imply such duties only where one party to a relationship is unable to fully protect its interests and the unprotected party has placed its trust and confidence in the other." We recognize no "invariable rule" for ascertaining a fiduciary relationship, "but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other."

*Id.* (quoting *High Plains Genetics Rsch., Inc.*, 535 N.W.2d at 842). "[A]s a matter of law, a fiduciary relationship exists whenever a power of attorney is created." *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 26, 721 N.W.2d at 445.

[¶47.] The circuit court gave instruction number 15, which provided:

> The court has determined as a matter of law that the defendant was acting as a fiduciary for Robert Lynch by virtue of the power of attorney. The power of attorney document defines the scope of the fiduciary relationship you are directed to accept as having been proved.
>
> For any act outside of the scope of the power of attorney, you must determine whether a further fiduciary relationship exists.

> To establish a fiduciary relationship for acts outside of the power of attorney, the plaintiff must prove:
>
> > (1) That Robert Lynch placed faith, confidence, and trust in the defendant;
> > (2) That Robert Lynch was in a position of inequality, dependence, or weakness, or possessed a lack of knowledge; and
> > (3) That the defendant exercised dominion, control, or influence over Robert Lynch's affairs.
>
> If you find that all of these elements have been established, then the defendant owed Robert Lynch a fiduciary duty for any act outside of the scope of the power of attorney.

[¶48.] While jury instruction number 15 correctly states the rules for determining whether a fiduciary duty exists, generally, the court—not the jury—must determine whether a fiduciary relationship exists. To the extent there were questions of fact relating to whether a fiduciary duty existed, the court could have permitted the jury to resolve any disputed facts before the court decided the legal question of whether Kevin owed Bob a fiduciary duty in managing the joint account.

[¶49.] However, the facts involving Kevin's management of the joint account appear to be undisputed. There is no dispute that all of the funds in the joint account were owned by Bob from 2011 until his death or that Kevin exerted exclusive control over Bob's finances and property, including the joint account, after Bob entered the nursing home in 2011. During this time, by Kevin's own testimony, Bob placed complete trust and confidence in Kevin's management of his finances and the farm.

[¶50.] Further, because of Bob's health limitations, Bob fully relied upon Kevin to manage and provide information about the joint account, and Kevin exercised dominion and control over the account after 2011. Kevin made all the

deposits to the joint account, wrote nearly all the checks from the account, received the monthly bank statements, and prepared Bob's tax returns each year. There is no evidence that Bob received any bank statements or information about the joint account, except through Kevin, after 2011. Kevin also admitted that he did not provide any accountings to Bob and that Bob was only aware of his finances to the extent Kevin verbally informed Bob and discussed them with him. Based upon the state of the record, there do not appear to have been any jury questions bearing on the fiduciary duty Kevin owed Bob in the management of the joint account. However, even if the court erred by instructing the jury to determine whether Kevin owed Bob a fiduciary duty in the management of the joint account from 2011 until Bob's death, the Estate has failed to show prejudice arising from the error.

[¶51.] On the Estate's claim for breach of fiduciary duty, the verdict form asked a single question: "Do you find in favor of Plaintiff or Defendant on the Plaintiff's claim Breach of Fiduciary Duty?" The verdict form did not require the jury to state separately whether Kevin owed Bob a fiduciary duty in writing checks on the joint account. Thus, the jury could have reached its verdict by finding the absence of a fiduciary duty based upon instruction number 15, or the jury could have determined that a fiduciary duty existed and that Kevin did not breach the duty. In *State Farm Mutual Automobile Insurance Co. v. Miranda*, we addressed the question of prejudice under a general verdict form and stated that where "a general verdict [was] handed down and the jury could have decided the case on two theories, one proper and one improper, the reviewing court will assume that it was decided on the proper theory." 2019 S.D. 47, ¶ 10, 932 N.W.2d 570, 574 (citations

omitted). We only depart from this assumption "if there is 'an affirmative showing in the record to the contrary[.]'" *Id.* (citations omitted). Therefore, we assume the jury decided Kevin owed but did not breach a further fiduciary duty to Bob and affirm with respect to those transactions for which oral extrinsic evidence of Bob's approval was admissible.

### 3. *Ownership of the joint checking account.*

[¶52.] The Legislature has established rules for ownership of joint checking accounts at an account holder's death:

> (1) Sums remaining on deposit at the death of a party to a joint account belong to the surviving party . . . as against the estate of the decedent unless there is clear and convincing evidence of a different intention *at the time the account is created. . . .*
>
> (5) A right of survivorship arising from the express terms of the account . . . or a P.O.D. payee designation *cannot be changed by will, unless the will expressly provides that the terms of the account should be changed or modified.*

SDCL 29A-6-104 (emphasis added).

[¶53.] SDCL 29A-6-104 creates a rebuttable presumption of joint tenancy in a jointly held bank account. *In re Estate of Kuhn*, 470 N.W.2d 248, 250 (S.D. 1991). A party challenging this presumption "must present clear and convincing evidence that [the decedent] 'did not intend the usual rights of survivorship to attach to the joint asset, but instead intended the arrangement for [their] own convenience.'" *Estate of Card v. Card*, 2016 S.D. 4, ¶ 15, 874 N.W.2d 86, 91 (quoting *In re Estate of Steed*, 521 N.W.2d 675, 678 (S.D. 1994)). "Whether the joint accounts in question were created by decedent for [their] own convenience or for the benefit of the

nondepositing joint payees is a question of fact to be determined from all the facts and circumstances in the case." *Id.* (quoting *Steed*, 521 N.W.2d at 678).

[¶54.] "[A] circuit court's decision to grant or deny a motion for judgment as a matter of law must be reviewed de novo on appeal." *Magner v. Brinkman*, 2016 S.D. 50, ¶ 13, 883 N.W.2d 74, 81. "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." SDCL 15-6-50(a).

[¶55.] Bob authorized Kevin to write checks on Bob's account on February 1, 2008, with a limited power of attorney form that was set up for the account at the bank. On May 13, 2008, Bob changed the account to a joint checking account with rights of survivorship. Nonetheless, the Estate argues that fact questions existed for the jury concerning Kevin's claim for conversion and Bob's intent in setting up the joint account.[12] In particular, the Estate notes that "[i]n this case, the evidence

---

12. "A successful claim for conversion will meet four necessary elements: (1) [plaintiff] owned or had a possessory interest in the property; (2) [plaintiff's] interest in the property was greater than the [defendant's]; (3) [defendant] exercised dominion or control over or seriously interfered with [plaintiff's] interest in the property; and (4) such conduct deprived [plaintiff] of its interest in the property." *Estate of Thacker*, 2023 S.D. 2, ¶ 41, 984 N.W.2d at 691–92 (alterations in original) (citations omitted). Aside from the Estate's claim that there was evidence to rebut the statutory presumption that Bob created a joint account, the Estate does not argue that questions of fact existed as to any of the elements of conversion.

did not all point one way, and there was evidence, i.e., Kevin Lynch's admission that the account was set up for convenience to pay his father's bills, thus a reasonable inference existed to sustain the position of the Estate."

[¶56.] The Estate's claim that Kevin made an admission that the joint account with rights of survivorship was set up for convenience is unsupported by the record. Critically, Kevin testified at trial that he was not present when Bob set up the initial limited POA in February 2008 or when Bob established the joint account three months later, that he had no discussion with Bob about creating the joint account, and that he had no knowledge about why Bob had set up the joint account.[13] Kevin was simply unable to offer any competent evidence about Bob's decision to create the joint account because Kevin did not have any knowledge about

---

13. The Estate's "admission" claim is predicated on its effort to impeach Kevin's testimony at trial by offering a portion of his prior deposition testimony:

> Estate counsel: "Was that joint account set up for the convenience of your father to pay his bills?"
> Kevin: "It was set up for me to take care of paying all his bills."
> Estate counsel: "The purpose of it was for his convenience to pay – make sure his bills were paid and that you paid them."
> Kevin: "Yes."

On redirect testimony at trial, Kevin's attorney read the following portions of Kevin's deposition testimony:

> Estate counsel: "Why was this account changed from a POA account in February 2008 to a joint account with rights of survivorship on May 13 of 2008?"
> Kevin: "You know, you are going to have to discuss that with the bank because I was not involved in that."
> . . .
> Estate counsel: "You never talked with your dad at all about why this was set up as a joint account with rights of survivorship."
> Kevin: "No. This was never discussed."

this decision. The Estate failed to present any other evidence to show that Kevin or anyone else had knowledge that Bob's decision to change the account was merely for convenience. This included the personal banker who assisted Bob with both changes and testified that she had no recollection of any conversations with him about these changes. From our review of the record, the circuit court properly determined that the Estate failed to present any evidence to rebut the statutory presumption that Bob intended to create a joint survivorship account with Kevin in May 2008.

[¶57.] We are mindful that Bob executed the Will in 2010, after the joint account was created, dividing "all" of his cash assets between the three surviving children share and share alike, "including certificates of deposit, savings accounts, and checking accounts." However, SDCL 29A-6-104(1) requires "evidence of a different intention *at the time the account is created*" to rebut the presumption of joint tenancy. (Emphasis added). More importantly, "[a] right of survivorship arising from the express terms of the account . . . cannot be changed by will, unless the will expressly provides that the terms of the account should be changed or modified." SDCL 29A-6-104(5). The Will did not expressly provide for a modification of the joint account, nor was it evidence of a contrary intention by Bob with respect to the joint account, and the circuit court properly granted judgment as a matter of law for Kevin on his claim for conversion.

## Conclusion

[¶58.] We reverse and remand the judgment as to the Estate's claims involving the two payable-on-death CDs Kevin deposited in his individual account.

On remand, the circuit court shall enter judgment as a matter of law for compensatory damages of $31,590.22, plus prejudgment interest, on the Estate's claims for breach of fiduciary duty and conversion.  Based upon this disposition, the Estate's claim for punitive damages on this portion of the Estate's claims remains an open question on remand.  The remainder of the judgment on the Estate's claims and Kevin's claim for conversion is affirmed.

[¶59.]    KERN, SALTER, DEVANEY, and MYREN, Justices, concur.